MID–TEXAS COMMUNICATIONS
SYSTEMS, INC., et al.,
Plaintiffs-Appellees,

v.

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY et al.,
Defendants,

Southwestern Bell Telephone Company,
Defendant-Appellant.

No. 79–1221.

United States Court of Appeals,
Fifth Circuit.

May 1, 1980.

Rehearing and Rehearing En Banc
Denied May 27, 1980.

1374

Walter E. Workman, David P. Cotellesse, James M. Shatto, Houston, Tex., George L. Saunders, Jr., Chicago, Ill., for defendant-appellant.

McGinnis, Lochridge & Kilgore, George D. Byfield, David L. Orr, Austin, Tex., Butler, Binion, Rice, Cook & Knapp, Louis B. Paine, Jr., Houston, Tex., for Mitchell Energy, etc., et al.

Before AINSWORTH, INGRAHAM and GARZA, Circuit Judges.

AINSWORTH, Circuit Judge:

This is an antitrust action by Woodlands Telecommunications Corporation (WTC) for damages against Southwestern Bell Telephone Company (Bell) based on alleged violations of sections 1 and 2 of the Sherman Anti-trust Act, 15 U.S.C. §§ 1 & 2. WTC, a new corporation formed for the purpose of providing telephone service within a new residential development outside of Houston, Texas, known as The Woodlands, based its suit principally on the refusal of the defendant to provide toll interconnection of the proposed telephone facility with the Bell System. The case was submitted to a jury on special interrogatories resulting in a verdict in favor of WTC against Bell for

$18,369,827 damages which was trebled by the court in a final judgment for $55,109,-481.[1] Defendant's motion for judgment n.o.v. or, in the alternative, for a new trial was denied. Bell has appealed from the judgment and asserted several grounds of error in the trial which raise novel questions of the proper accommodation of the antitrust laws with the regulation of the telecommunications industry. We reverse and remand for a new trial for reasons we shall detail.

## I. Introduction

### a. The Pertinent Facts

We set forth an outline of those facts necessary to our decision. During the early 1970's Mitchell Energy & Development Corporation (Mitchell) began the planning of a new community to be located about 28 miles north of Houston. Eighteen thousand acres of vacant land was acquired by it for the building of a proposed city of an ultimate population of 150,000 persons by the 1990's. This community, to be known as The Woodlands, was to be developed by Mitchell's wholly owned subsidiary, The Woodlands Development Corporation. It qualified under the Urban Growth and New Community Development Act of 1970, 42 U.S.C. § 4501 et seq., which provides for government guarantees of the bonds of private new community developers up to a maximum of $50,000,000, and the Secretary of Housing and Urban Development granted the developers a bond guarantee for the maximum amount. 42 U.S.C. § 4514.

In early 1971 Mitchell's representatives met with those of various utility companies to investigate possible means of providing basic services to The Woodlands. Mitchell attempted to obtain financial assistance in the form of payments or percentage of revenues from these companies in return for the right to serve The Woodlands. Subsequently, representatives of Mitchell and Bell met to discuss the providing of telephone services in the proposed development. Bell expressed its willingness to furnish the telephone services required, but objected to giving financial assistance because it would be inconsistent with Bell's obligations as a regulated common carrier, and with general company policy. Mitchell then began investigating the possibility of establishing a new independent telephone company to serve The Woodlands.

In order for an independent telephone company to do business it was essential that its local lines interconnect with the existing Bell System interstate network so that its customers would have long-distance service. It was also necessary that an independent company have central office three-digit numbers known as NNX codes which are assigned and coordinated by the Bell System operating companies.

Bell claimed that in accordance with its published tariffs The Woodlands was located primarily in areas which were part of its Spring and Pinehurst exchanges. Twenty per cent of the site was in an exchange operated by Conroe Telephone Company, an independent. Mitchell negotiated with Mid-Texas Communications Systems, Inc. (Mid-Texas), an independent telephone company, which led to the formation of a new jointly owned independent to be known as Woodlands Telecommunications Corporation, plaintiff in this case. WTC then requested that Bell provide NNX codes and interconnection with the proposed new telephone system. Bell refused to interconnect voluntarily. It planned to serve the area itself. Bell contended that establishment of a new independent telephone company was contrary to the public interest and would be a wasteful duplication of facilities with those of Bell. Bell stated that it would interconnect with WTC only if ordered to do so by state or federal regulatory authorities.

Accordingly, on November 9, 1972, WTC filed an informal complaint with the Federal Communications Commission (FCC) seeking an order under authority of section 201(a) of the Communications Act of 1934, 47 U.S.C. § 201(a), to require Bell to interconnect with its proposed facilities. Bell

---

1. Treble damages are provided for in section 4 of the Clayton Act, 15 U.S.C. § 15.

responded on December 13, objected to interconnection, and stated its own intention to serve The Woodlands. On March 20, 1973, the parties attended a conference with FCC staff members about the pending complaint of WTC. Bell's attorney stated at the meeting that if interconnection was ordered by FCC in connection with the proposed interstate service it would appeal the order to the courts. Intrastate connection would still require compliance with the Texas statutory procedure. Bell insisted upon a full evidentiary hearing on the record before the FCC but the Commission decided that such a hearing was not required in light of the need for expedited decision and thus the matter was to be determined by the FCC on written submission of the parties. After further discussion between WTC and Bell representatives, WTC concluded on July 11 to discontinue its efforts to serve The Woodlands, thereby clearing the way for Bell to do so, and on August 2, a majority of WTC directors voted to withdraw the FCC complaint. The parties dispute the circumstances of the withrawal of the complaint; WTC contends it was economically coerced by defendant Bell, which responds that the withdrawal was voluntarily made.

### b. The Proceedings in the District Court

WTC filed this suit on November 19, 1973 against Bell and American Telephone & Telegraph Company (AT&T) alleging a conspiracy to monopolize and restrain trade in the furnishing of telecommunications services in The Woodlands in violation of the Sherman Antitrust Act. Bell counterclaimed against WTC and cross-claimed against Mid-Texas, Mitchell and Woodlands Development Corporation, also on Sherman Act grounds. Defendants' motion to dismiss the complaint on the basis that it was immune from antitrust action because of the provisions of the Communications Act of 1934 (47 U.S.C. § 151 *et seq.*) was denied by the district court. *See Woodlands Telecommunications Corp. v. AT&T*, 447 F.Supp. 1261 (S.D.Tex.1978). Thereafter,

during the course of the trial AT&T was dismissed as a defendant. As previously indicated, the jury's verdict was in favor of WTC and Bell brought this appeal.

On appeal, Bell raises four principal issues. First, that the district court erred in applying the antitrust laws to an interconnection dispute which was subject to state and federal regulations, under a standard inconsistent with the antitrust standard of competition. Second, Bell contends that under the circumstances it is immune from antitrust liability because it is entitled to the protection provided by the doctrine enunciated in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the so-called *Noerr-Pennington* doctrine, which protects the rights of freedom of expression and resort to governmental processes. Bell's third issue is that the trial judge erroneously limited Bell's defense on the impact of regulation by refusing to give any instructions to the jury on the nature and effect of federal and state regulation of the telecommunications industry in connection with the issues before it. Bell also contends that the damages assessed were based upon a damage model improper as a matter of law. We discuss these issues in order.[2]

### II. Implied Immunity

Bell's primary contention is that the district court erred in applying the antitrust laws to an interconnection dispute which was subject to regulation both by state and federal authorities. Thus Bell asserts that antitrust liability cannot be imposed upon it for failure voluntarily to interconnect with WTC. The federal regulatory authority is found in section 201(a) of the Communications Act, 47 U.S.C. § 201(a), which reads as follows:

It shall be the duty of every common carrier engaged in interstate or foreign

2. In light of our resolution of the main issues in this case, we need not discuss Bell's other contentions.

communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

Section 201(a) does not expressly exempt a carrier from antitrust liability for refusing a request to interconnect,[3] but Bell argues that it would be unfair to subject it to antitrust liability in light of the FCC's ultimate statutory control over interconnection. Under this construction by Bell, the public interest standard controlling interconnection under section 201(a) is inherent-

ly inconsistent with the anticompetitive standard for assessing liability under the antitrust laws. Bell asserts a right—and indeed an obligation—to oppose interconnection in those cases where it believes that the public interest would not thereby be served, subject only to review of its action by the FCC pursuant to section 201(a). To allow both antitrust and regulatory standards to operate independently would, it is contended, place Bell in a dilemma. Either Bell would be forced to approve all interconnection requests regardless of the public interest involved, or it could continue to refuse those requests it deems not in the public interest only at risk of substantial antitrust liability. Bell asserts that the only fair method of resolving the matter is for the court to hold that section 201(a) creates an implied immunity from the antitrust laws.[4]

The Supreme Court has repeatedly held that "[r]epeals of the antitrust laws

3. The Communications Act does provide explicit exemptions for telephone company consolidations and acquisitions. 47 U.S.C. §§ 221(a), 222(c)(1). The existence of an explicit exemption in one part of the Act does not provide authority for the proposition that other actions not directly covered are impliedly exempt. *Industrial Communications Systems, Inc. v. Pacific Tel. & Tel. Co.*, 505 F.2d 152, 156 (9th Cir. 1974). The existence of explicit immunities may indicate that Congress did not intend for courts to imply exemptions in other parts of the statute. *See California v. FPC*, 369 U.S. 482, 485, 82 S.Ct. 901, 904, 8 L.Ed.2d 54 (1962); *United States v. Borden Co.*, 308 U.S. 188, 200–01, 60 S.Ct. 182, 189–90, 84 L.Ed. 181 (1939); *Cain v. Air Cargo, Inc.*, 599 F.2d 316, 320 (9th Cir. 1979). In order to assure the proper relationship between regulatory provisions and antitrust safeguards, courts must inquire if "application of the antitrust laws would seriously undermine a comprehensive regulatory scheme," even in the absence of explicit exemption. *See* Note, *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity*, 85 Yale L.J. 254, 269–70 n.76 (1975). *Cf. Pan Amer. World Airways, Inc. v. United States*, 371 U.S. 296, 320–21, 83 S.Ct. 476, 490, 9 L.Ed.2d 325 (1963) (Brennan, J., dissenting).

4. Bell also argues that federal and state regulation of the telecommunications industry is so pervasive as to warrant blanket immunity for its actions in this case. *See United States v. National Ass'n Sec. Dealers, Inc.*, 422 U.S. 694, 730, 95 S.Ct. 2427, 2448, 45 L.Ed.2d 486 (1975);

*Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363, 387–89, 93 S.Ct. 647, 661–62, 34 L.Ed.2d 577 (1973); *Pan Amer. World Airways, Inc. v. United States*, 371 U.S. 296, 300–01, 83 S.Ct. 476, 480, 9 L.Ed.2d 325 (1963). Bell contends that immunity is justified because "scarcely a single business act is free from continuous regulation or at least [some] administrative governmental review." *Carter v. AT&T*, 365 F.2d 486, 495 (5th Cir.), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). *See Western Electric Co. v. Milgo Electronic Corp.*, 568 F.2d 1203 (5th Cir.), *cert. denied*, 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978). Neither *Carter* nor *Western Electric* considered the immunity question directly. *Carter* concerned the application of the doctrine of primary jurisdiction, whereas *Western Electric* involved the appealability of an FCC order. Indeed, courts have often rejected the argument that antitrust immunity should be implied because of the pervasiveness of federal and state regulation. *See, e. g., Essential Communications Systems, Inc. v. AT&T*, 610 F.2d 1114 (3d Cir. 1979); *MCI Communications Corp. v. AT&T*, 462 F.Supp. 1072, 1080–82 (N.D.Ill.1978); *United States v. AT&T*, 427 F.Supp. 57, 60–61 (D.D.C.1976), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977); *Macom Products Corp. v. AT&T*, 359 F.Supp. 973, 976 (C.D.Cal.1973). Federal and state regulation of the telecommunications industry is not so pervasive as to justify a blanket immunity.

by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963) (footnotes omitted). *See Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975). The unwillingness of the courts to imply antitrust immunity is based on recognition that the "antitrust laws represent a fundamental national economic policy" which should not be lightly disturbed. *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 218, 86 S.Ct. 781, 784, 15 L.Ed.2d 709 (1966). Therefore, immunity will be implied only if necessary to permit the regulatory scheme to function, and then only to the "minimum extent necessary." *Silver v. New York Stock Exchange,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

 In the FCC's determination of the "public interest" question under the Act there is no doubt that competition is a relevant factor. *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 1004, 97 L.Ed. 1470 (1953). Competition per se, however, is not the sole touchstone for decision since competition is not the only consideration. *RCA, supra,* 346 U.S. at 93, 73 S.Ct. at 1003; *Hawaiian Telephone Co. v. FCC,* 498 F.2d 771, 775–77 (D.C.Cir.1974). Rather, the FCC must consider all factors relating to the "public convenience and necessity." *Hawaiian Telephone,* 498 F.2d at 776. In general, the public interest is to be considered in light of the overall purpose of the Communications Act "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nationwide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . .." 47 U.S.C. § 151. As decisions under section 201(a) reveal, the FCC considers a number of specific noncompetition-related factors in determining the public interest in interconnection cases. *See, e. g., Oklahoma-Arkansas Telephone Co. v. Southwestern Bell Telephone Co.,* 6 F.C.C. 809 (1939) (adequacy of

existing service); *In the Matter of Western Union Telegraph Co.,* 17 F.C.C. 152, 171–75 (1952) (lack of evidence of public necessity resulting in a "blank check" for competitor to serve most profitable routes if interconnection were ordered). Since an analysis of competitive effects is not decisive, the FCC may not adequately safeguard antitrust interests. Thus, in the absence of clear conflict, the antitrust laws must be permitted to operate.

WTC argues that the Supreme Court's decision in the antitrust case of *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), controls the question of Bell's implied immunity here. In that case, Otter Tail Power Company, an electric utility that generated and transmitted electric power to hundreds of communities in Minnesota, North Dakota, and South Dakota, allegedly violated the antitrust laws by a number of predatory actions. Within each town, Otter Tail operated pursuant to a 10-20-year franchise granting monopoly status in the locality. In four communities, the citizens voted to establish independently owned systems at the expiration of the Otter Tail franchise. Localities wishing to establish independent systems either had to obtain wholesale power directly from Otter Tail itself or purchase it elsewhere and have Otter Tail "wheel" the power over its transmission lines. When asked to provide or wheel power, Otter Tail refused. Two localities filed complaints before the Federal Power Commission (FPC) to compel Otter Tail to interconnect. One town successfully pursued its claim, but the other withdrew its complaint and restored Otter Tail's franchise. Two other towns were able to contract for power elsewhere only to have Otter Tail refuse to wheel it. In addition, Otter Tail had either initiated or sponsored litigation unrelated to the FPC proceedings which had the effect of frustrating the towns' plans by interfering with their ability to float revenue bonds needed to finance the independent systems.

Otter Tail contended that it was insulated from antitrust liability because of existing

federal regulation, relying specifically on section 202(b) of the Federal Power Act, which grants FPC authority to compel interconnection if found to be "necessary or appropriate in the public interest." 16 U.S.C. § 824a(b). The Supreme Court rejected the argument on the ground that the statutory provision was designed to foster voluntary interconnection. After reviewing the relevant legislative history the Supreme Court held that Congress rejected a pervasive regulatory scheme "in favor of voluntary commercial relationships. When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." *Otter Tail, supra,* 410 U.S. at 374, 93 S.Ct. at 1028. Thus, there was no basis for concluding that Congress intended to displace the antitrust laws in that case.

Relying on *Otter Tail,* the district court in the present case held that Bell was not entitled to antitrust immunity because its initial decision whether to interconnect was a matter of business judgment and was not the product of "regulatory supervision." *Woodlands Telecommunications Corp. v. AT&T,* 447 F.Supp. 1261, 1265–66 (S.D.Tex. 1978). The district court noted that "[i]f the refusal to interconnect is for the express purpose of excluding competition, as is alleged in this case, the antitrust laws may provide another remedy in addition to section 201(a)." *Woodlands Telecommunications, supra,* 447 F.Supp. at 1266.

However, to categorize Bell's decision as purely voluntary or only a matter of business judgment is somewhat misleading. As Bell argues, its decision is not voluntary in the full sense of the word because Bell conforms its policies to the regulatory provision by considering factors related to the public interest when deciding whether to interconnect. Thus, Bell asserts that it would be inherently unfair to subject it to antitrust liability for decisions which it considers are taken in the public interest.

Bell's position is not without merit. Undoubtedly there may be situations where interconnection should not be permitted since it would not be in the public interest. To argue otherwise would be to ignore the effect of the statutory inquiry; the statute envisions interconnection requests that are both in the public interest and those that are not. When an interconnection is not in the public interest, Bell's refusal is obviously supportable, for without the refusal, an undesirable interconnection would occur. In those instances where interconnection is not in the public interest, the statutory framework places the initial onus of refusal on Bell. To create the potential for antitrust liability where Bell is acting to safeguard the public interest would be contrary to public policy. Fairness to the regulated industry is an important factor, therefore, in determining whether antitrust immunity exists. *See* Note, *Antitrust and Regulated Industries: A Critique and Proposal for Reform of the Implied Immunity Doctrine,* 57 Tex.L.Rev. 751, 757, 787–88 (1979).

■ Nevertheless, it would be improper to imply that all decisions refusing interconnection are immune. Though the refusal may be based upon articulable concerns of public policy, it may also be possible to rationalize a decision whose purpose is anticompetitive. While section 201(a) provides a mechanism to compel interconnection, the FCC cannot always provide complete relief to an injured competitor. The FCC's mandate is not explicitly centered upon competitive effects so that its inquiry into antitrust concerns may be obscured. Nor is the FCC empowered to award damages in favor of the injured competitor.[5] Thus, an antitrust court has an important role in preventing misuse of the public interest standard. Accordingly, section 201(a) of the Communications Act does not as a matter

---

5. *See generally United States v. AT&T,* 461 F.Supp. 1314, 1328 n. 43 (D.D.C.1978). *See* also *Nader v. FCC,* 520 F.2d 182, 206 (D.C.Cir. 1975).

of law automatically grant Bell immunity from the effects of the antitrust laws.[6]

Nevertheless, to the extent that Bell based its decision here on articulable concerns relating to the public interest as defined in section 201(a), it is entitled to a measure of protection from the effects of the antitrust laws. As we discuss later in Section III of this opinion, Bell's claimed reliance on public interest concerns in denying an interconnection request are relevant to an assessment of Bell's alleged monopolistic purpose or intent. Thus, while we affirm the district court's ultimate holding that Bell's actions are not immune as a matter of law, we disagree with the district court's analysis that section 201(a) is unrelated to Bell's initial decision whether to interconnect. Throughout the course of proceedings, Bell has argued that its decision was affected by concerns related to the public interest as provided in section 201(a). Bell's actions may have been so constrained, and its actions must be considered in a different light than if no regulatory provision which could mandate interconnection existed, for it is entirely plausible that its initial decision whether to interconnect was closely tied to the public interest inquiry under section 201(a).

Bell also contends that its actions in this case were immune from antitrust liability by virtue of state regulation. Under Texas law applicable at the time of this suit,[7]

telephone companies were under an obligation to interconnect with other companies upon request, Tex.Rev.Civ.Stat.Ann. art. 1427, except that no telephone company could be compelled to interconnect for "any message originating at any point on its own lines." Tex.Rev.Civ.Stat.Ann. art. 1429. There was no statewide commission to resolve disputes concerning interconnection, but they were submitted to the local city councils or county commissioner's court which could order interconnection if found to be "necessary for public convenience." Tex.Rev.Civ.Stat.Ann. art. 1430. Failure to comply with an order from the appropriate local authority could result in a maximum penalty of ten dollars per day. Tex.Rev. Civ.Stat.Ann. art. 1431. Bell contends that local authorities were required to deny an interconnection request if an existing telephone company was already serving the area, citing in support of its contention *Ohmes v. General Telephone Co.,* 384 S.W.2d 796, 799 (Tex.Civ.App.—Amarillo 1964, writ ref'd).

As with federal regulatory provisions, there exists a strong presumption against finding antitrust immunity on the basis of state regulation. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 595–98 & nn. 36, 37, 96 S.Ct. 3110, 3120 & nn. 36, 37, 49 L.Ed.2d 1141 (1976). Thus, the mere possibility of a conflict between state regulation

---

6. *See generally MCI Communications Corp. v. AT&T,* 462 F.Supp. 1072, 1089–96 (N.D.Ill. 1978) (no immunity for refusing to interconnect with specialized communications carrier); *United States v. AT&T,* 461 F.Supp. 1314, 1320–30 (D.D.C.1978) (no immunity for alleged predatory practices including refusals to interconnect with long-distance telephone facilities). *See also Essential Communications Systems, Inc. v. AT&T,* 610 F.2d 1114 (3d Cir. 1979); *Jarvis, Inc. v. AT&T,* 481 F.Supp. 120, 123 (D.D.C.1978).

In its brief plaintiff also calls to our attention the position enunciated in the amicus brief of FCC filed in *United States v. AT&T,* 427 F.Supp. 57, 58 (D.D.C.1976), *cert. denied,* 429 U.S. 1071, 98 S.Ct. 507 54 L.Ed.2d 452 (1977). There it was alleged that AT&T had refused interconnection with new independent telephone companies organized to serve new communities. *Memorandum of FCC as Amicus Cu-*

*riae, reprinted* at 62 F.C.C. 1102, 1130. The FCC's brief stated in part that:

[f]or purposes of communications policy, interconnection in that circumstance would appear to be a neutral act; if it were required for reasons of competition, and if there were no affirmative communications policy reasons to *forbid* interconnection, maintenance of an antitrust action would not necessarily interfere with Commission regulation.

62 F.C.C.2d at 1112–13 (emphasis in original).

7. In 1976, Texas enacted a new statute creating a state-wide regulatory commission with jurisdiction over the telecommunications industry. Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp.1979). The new law treats interconnections in a manner similar to section 201(a) in that interconnection refusals are subject to review by a centralized commission under a public interest standard. Tex.Rev.Civ.Stat.Ann. art. 1446c § 61(2) (Vernon Supp.1979).

and federal antitrust standards is insufficient to support a finding of immunity. *Cantor, supra,* 428 U.S. at 596, 96 S.Ct. at 3120.[8]

A review of applicable Texas law demonstrates that immunity from federal antitrust law is not "imperative in the continued effective functioning" of the state regulatory scheme. *Cantor, supra,* 428 U.S. at 595–96 n. 36, 96 S.Ct. at 3120–21 n. 36. Like its federal counterpart, Texas law relies, in the first instance, on the decision of each individual telephone company whether to interconnect. Indeed, Texas law is substantially less potent in that no statewide regulatory commission was available to force interconnection, but control, to the extent that it existed at all, was exercised by decentralized local authorities. *See* Fulda, *Telephone Regulation in Texas: Should Regulation by Cities Be Replaced by a State Commission?* 45 Tex.L.Rev. 611, 618–20 (1967). Accordingly, since Bell's actions were not compelled by state regulatory actions they were not immune by virtue of state regulation. *See Interconnect Planning Corp. v. AT&T,* 465 F.Supp. 811 (S.D. N.Y.1978).

### III. *Noerr-Pennington*

Bell's second major contention is that its actions are immune from antitrust liability under the so-called *Noerr-Pennington* doctrine. The guiding principle behind the *Noerr-Pennington* immunity is to insure "uninhibited access to government policy makers." *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 424 F.2d 25, 32 (1st Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 54, 27 L.Ed.2d 88 (1970). Initially the doctrine was applied to efforts to influence legislative and executive action. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (publicity campaign by railroad companies designed to obtain legislation adverse to trucking indus-

try); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (joint effort by employers and union to influence public officials even though intended to eliminate competition). It is now clear, however, that *Noerr-Pennington* immunity extends to attempts to influence judicial and administrative actions since the "right to petition extends to all departments of the Government." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). *See generally* Fishel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 96–104 (1977).

Bell contends that under *Noerr-Pennington* antitrust liability cannot be imposed for actions taken to bring important questions before governmental authorities for resolution. Thus Bell asserts that its refusal to interconnect is protected since refusal was a necessary first step in bringing the dispute before the FCC.

The crux of the *Noerr-Pennington* immunity is the need to protect efforts directed to governmental officials for the purpose of seeking redress. The doctrine has been applied only to situations involving direct actions made to influence governmental decisionmaking. *See, e. g., Noerr, supra* (publicity campaign designed to influence passage of state laws); *California Motor, supra* (instituting state and federal proceedings to defeat award of operating rights); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board,* 542 F.2d 1076 (9th Cir. 1976) (direct lobbying efforts opposing building permit grants before zoning board), *cert. denied,* 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977); *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir. 1975) (making representations to local city council concerning cable television franchise). Bell's initial decision to refuse interconnection

---

**8.** *See generally Goldfarb v. Virginia State Bar,* 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975) (antitrust immunity should be recognized only where state law compels action taken by regulated company). *See also Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 456–57, 42 L.Ed.2d 477 (1974).

was not directed toward any governmental agency or official. Bell was not required to consult with the FCC or obtain approval of its decision to refuse interconnection. Therefore, refusal was a necessary first step if FCC action was to occur. Until the governmental process is initiated, however, *Noerr-Pennington* immunity should not extend to actions occurring in an essentially private context. Bell's initial refusal to interconnect, therefore, was not an attempt to influence governmental action so as to warrant protection under *Noerr-Pennington*.

Bell contends that this court's decision in *International Telephone & Telegraph Corp. v. United Telephone Co. of Florida*, 550 F.2d 287 (5th Cir. 1977), controls this case. In *United Telephone*, plaintiff ITT entered into an agreement with the developers of an extensive real estate project, whereby ITT would provide the equipment for a central telephone terminal system. In order to provide service to areas outside the development, the developers requested interconnection with United's facilities. The developers did not have an operating certificate from the state regulatory commission, which was a prerequisite to operation. Accordingly, United filed a complaint with the Florida Public Service Commission questioning the legality of the proposed interconnection under state law, but stating its willingness to interconnect to the extent that the operation was legal. The developers, joined by intervenor ITT, moved to dismiss the complaint, which was denied by the Commission, and neither party appealed from the adverse decision. The Commission later terminated the proceedings as moot when the developers abandoned their effort to install the telephone system. The Commission said in its order that the proposal in fact violated state law since the developers did not have a certificate of public convenience and necessity. ITT then brought suit for damages against United under the antitrust laws, alleging that United had filed a "sham" complaint with the Commission. This court held that the antitrust suit was barred by operation of the *Noerr-Pennington* doctrine since United properly

brought the dispute before the Commission which was "the authority to determine whether the actions herein would be unlawful under Florida law." *United Telephone, supra*, 550 F.2d at 289.

Bell asserts that it did nothing more than bring this matter before the FCC which had the authority to determine the validity of the refusal under federal law to interconnect. The cited case is distinguishable, however, from the present case. First, in *United Telephone*, the regulatory scheme permitted United itself to commence administrative review by the filing of a complaint, unlike the situation in the present case where Bell did not initiate the FCC proceeding. The complaint in *United Telephone* did not allege a series of wrongful acts, but contended that the filing of the complaint itself before the state regulatory agency was sufficient to subject United to antitrust liability. In the present case, WTC alleges anticompetitive actions beyond the scope of the FCC action. The regulatory agency in *United Telephone* actually decided the merits of the dispute in favor of United, and it would be difficult to conclude that the filing of a complaint constitutes a sham where the party seeking relief actually prevails. *See, e. g., Taylor Drug Stores, Inc. v. Associated Dry Goods Corp.*, 560 F.2d 211, 213 (6th Cir. 1977); *Franchise Realty, supra*, 542 F.2d at 1079; *Central Bank of Clayton v. Clayton Bank*, 424 F.Supp. 163, 167 (E.D.Mo.1976), *aff'd mem.*, 553 F.2d 102 (8th Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). *See generally* 1 P. Areeda & D. Turner, Antitrust Law § 203 (1978). In the present case, the complaint was withdrawn prior to final FCC determination. The instant case is clearly different under the circumstances. Accordingly, we hold that Bell's initial decision refusing interconnection does not fall within the protection afforded by the *Noerr-Pennington* doctrine.

WTC also categorized Bell's procedural moves opposing its complaint before the FCC as "delaying tactics" which constituted anticompetitive conduct. For example, WTC argued that Bell's insistence upon

a full hearing on the record rather than agreeing to follow the written submission procedure suggested by the FCC staff was evidence of improper tactics. It is clear, however, that under *California Motor* Bell had a right to contest the FCC complaint regardless of any anticompetitive intent. *California Motor, supra,* 404 U.S. at 511, 92 S.Ct. at 612. WTC argues that Bell's actions before the FCC are not immune because they fall within the so-called "sham exemption" to *Noerr-Pennington* immunity which prevents a party from misusing governmental processes by employing means that achieve "substantive evils." *California Motor, supra,* 404 U.S. at 513–16, 92 S.Ct. at 613–14. *See Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286, 1296–98 (5th Cir. 1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1975).

█ In assessing the applicability of the "sham exemption" to Bell's direct representations before the FCC, it is important to note that it should be read narrowly in order to protect the first amendment right of access to administrative proceedings. *Franchise Realty, supra,* 542 F.2d at 1082. We must be particularly careful in considering allegations of sham in situations like the present one where the applicant withdrew its claim prior to final agency resolution since the administrative determination may benefit the factfinder in characterizing

the challenged action. *See* 1 P. Areeda & D. Turner, Antitrust Law § 203b (1978). *Cf. Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272, 279–80 (D.C.Cir.1972) (case alleging improper conduct before administrative agency deferred pending remand to the agency to determine issues relating to the supposed sham conduct).

In the present case, it is difficult to understand how Bell's direct dealings before the FCC can fairly be categorized as a sham. As the Supreme Court noted in *California Motor,* "[O]pponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused." *California Motor, supra,* 404 U.S. at 513, 92 S.Ct. at 613. *See MCI Communications Corp. v. AT&T,* 462 F.Supp. 1072, 1102–04 (N.D.Ill.1978).[9]

█ In summary, we hold that Bell is not entitled to immunity under the *Noerr-Pennington* doctrine since its refusal to interconnect was not directed toward influencing governmental action. Its direct dealings with the FCC, however, are entitled to that protection.[10]

---

9. Indeed, WTC has not alleged a consistent pattern whereby Bell refused interconnection requests in all cases and then raised points of procedure for the purposes of delay before the FCC. In fact, Bell has voluntarily interconnected with other independent phone companies in the past. Thus, the situation is unlike *California Motor* where it was contended that the various conspirators opposed every effort by a new competitor to enter the market by initiating administrative proceedings "without probable cause and regardless of the merits." *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). *Cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973) (power company instituted litigation against four municipalities that were attempting to create independent systems). *See generally* Note, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies:*

*Analogies to Malicious Prosecution and Abuse of Process,* 86 Harv.L.Rev. 715 (1974).

10. In this regard, Bell requested and was denied an instruction specifically setting forth the application of the *Noerr-Pennington* doctrine with respect to its opposition to WTC's complaint before the FCC. In particular Bell requested an instruction to the effect:

WTC claims that Southwestern Bell acted unlawfully in opposing WTC's informal complaint before the FCC to compel Southwestern Bell to interconnect, and in insisting that the FCC hold a formal evidentiary hearing to decide the matter. You are instructed that to demand a hearing before a court or an administrative agency does not violate the Sherman Act, even if such demand is made as a joint and concerted action, and even if the intent or purpose of the demand is to eliminate competition, unless that demand is purely and simply a sham. Therefore, you

## IV. Instructions to the Jury

Bell contends that the district court erred by failing to instruct the jury concerning the effect of regulation as it related to Bell's actions in refusing interconnection with WTC. The Supreme Court has recognized that consideration of federal and state regulation is proper in certain instances even after the issue of antitrust immunity has been resolved. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 627, 94 S.Ct. 2856, 2872–73, 41 L.Ed.2d 978 (1975) (application of the antitrust laws to bank mergers "must take into account the unique federal and state regulatory restraints" on defendant's conduct). *See Silver v. New York Stock Exchange*, 373 U.S. 341, 360–61, 83 S.Ct. 1246, 1258–59, 10 L.Ed.2d 389 (1963). The Ninth Circuit also has noted the continuing significance of regulation:

This is not to say that the nature and extent of regulation is, in the absence of an exemption, irrelevant from a factual perspective. The impact of regulation on pricing and other competitive factors is too obvious to be ignored. In the absence of an exemption claim, the fact of regulation is significant, but not because it embodies a doctrinal scheme different from the antitrust law; the sole legal perspective is that afforded by the antitrust law. Rather, the impact of regulation must be assessed simply as another fact of market life.

*International Telephone & Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 935–36 (9th Cir. 1975) (footnote omitted). Thus, the antitrust laws are not so inflexible as to deny consideration of governmental regulation. "[A]ntitrust courts can and do consider the particular circumstances of an industry and therefore adjust their usual rules to the existence, extent, and nature of regulation. Just as the administrative agency must consider the competitive premises of the antitrust laws, the antitrust court must consider the peculiarities of an industry as recognized in a regulatory statute." 1 P. Areeda & D. Turner, Antitrust Law § 223d (1978). *See Jacobi v. Bache & Co.*, 520 F.2d 1231, 1237–39 (2d Cir. 1975) (rejecting application of per se rule in light of regulation of stock exchange), *cert. denied*, 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976). *See also Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, at 354–355 (5th Cir. 1980) (April 11). The fact of regulation may therefore operate within the confines of the applicable antitrust laws.

The gravamen of WTC's theory of liability is that Bell violated section 2 of the Sherman Act by using monopoly power in the long-distance telephone market to hinder competition in the local Woodlands market.[11] WTC claims that Bell's refusal to deal with WTC in the long-distance market constituted a willful misuse of its monopoly power in violation of the antitrust laws. Illegal monopolization under section 2 has two distinct elements: (1) possession of monopoly power in the relevant market,

---

are instructed that, even if you believe that Southwestern Bell and AT&T combined or conspired to restrain trade as I have defined in those terms to you, you may not find that Defendants violated the Sherman Act unless WTC specifically proves by a preponderance of the evidence that Southwestern Bell opposed WTC's informal complaint before the FCC and demanded a hearing without any probable cause and totally regardless of the merits of Southwestern Bell's or AT&T's position under the Communications Act.

You are instructed that petitioning an administrative agency such as the FCC can result in certain delays because administrative procedures are often time consuming. Such delays are a price which businesses have to pay in our complex, highly regulated economy. Southwestern Bell and AT&T can-

not be held responsible for the delays occasioned solely by adherence to the statutory provisions and procedural requirements of the FCC. Such delays cannot, as a matter of law, form a basis for the finding of an antitrust violation.

Bell's Requested Instruction # 8 (footnotes omitted). While the district court instructed the jury on the import of *Noerr-Pennington* in general, we believe that in substance Bell's requested specific instruction was proper.

11. WTC originally alleged violations of both section 1 and section 2 of the Sherman Act. The subsequent dismissal of defendant AT&T, however, removed the section 1 conspiracy claims. Accordingly, WTC's claim against Bell was premised solely on section 2.

and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). *See generally Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 271–76 (2d Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). A monopolist may not arbitrarily or invidiously use its monopoly power in one market, even if lawfully obtained, to harm competition in another market. *See, e. g., United States v. Griffith*, 334 U.S. 100, 107–08, 68 S.Ct. 941, 945–46, 92 L.Ed. 1236 (1948); *Smith-Kline Corp. v. Eli Lily & Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978); *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Bell contends that the effect of regulation is relevant to the issue of the existence of monopoly power and misuse of that power.

### a. *Regulation and Monopoly Power*

▮ Monopoly power exists if a firm has "the power to control prices or exclude competition." *Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704. In the present case, the district court instructed the jury that:

Southwestern Bell has "monopoly power" in the relevant market in this case in that Southwestern Bell controlled the essential facilities of long-distance lines and NNX codes to which competitors must have access to do business. You are further instructed that the relevant market is the providing of telephone services to The Woodlands. Because the court has determined that Southwestern Bell possessed monopoly power in the relevant market, you need not deliberate on this element, but rather you are to regard it as proven by WTC by a preponderance of the evidence.

R. at 624. Thus, the district court withdrew this critical issue from the jury's consideration. Bell argues that this instruction was erroneous since it could not exclude competition from The Woodlands market given the existence of section 201(a) by which a competitor may petition the FCC for an order to interconnect. Specifically, Bell requested and was refused an instruction to the effect that:

You are instructed that the mere fact that Southwestern Bell may have had a monopoly in the provision of telephone service in certain markets or areas in the sense that it had a large share or the entire share of those markets would not be sufficient to establish that Southwestern Bell possessed monopoly power. As I instructed you earlier, Southwestern Bell as a regulated public utility under both state and federal law was under a common carrier duty to serve all would-be subscribers in its service areas upon demand.

.　　.　　.　　.　　.

In determining whether Southwestern Bell had monopoly power in the sense that it had the power to exclude competition, you are instructed that both Texas and federal law provided procedures to compel Southwestern Bell to connect with other telephone companies where certain conditions were met. To establish that Southwestern Bell had monopoly power, therefore, WTC must prove by a preponderance of the evidence that despite the authority of the FCC to order interconnection, Southwestern Bell nonetheless had the power to exclude competition. In this connection, I must remind you that my earlier instructions concerning Southwestern Bell's right to oppose WTC's informal complaint to the FCC and to insist upon a formal evidentiary hearing applies equally to the alleged offense of monopolization.

Bell's Requested Instruction # 13 (footnote omitted).

▮ In determining the proper instruction to the jury in this regard, the court should have been aware that in specific circumstances regulatory control is relevant to the existence of monopoly power and

may even prohibit a finding of such power as a matter of law. *See, e. g., Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 361 F.Supp. 774, 780 (W.D. Pa.1972) (company was not a monopolist since it lacked control over rate-making mechanism), *aff'd*, 481 F.2d 80 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *Redwing Carriers, Inc. v. McKenzie Tank Lines*, 443 F.Supp. 639, 641 (N.D.Fla.1977) (price for transportation of item set by regulatory agency so fact that one shipper may obtain a monopoly is irrelevant since price will be unaffected), *aff'd*, 594 F.2d 114 (5th Cir. 1979); *Nankin Hospital v. Michigan Hospital Service*, 361 F.Supp. 1199, 1209–10 & n. 33 (E.D.Mich. 1973) (company does not possess monopoly power since rates controlled and actively reviewed by state insurance commission). *Cf. International Railways of Central America v. United Brands Co.*, 532 F.2d 231, 240 (2d Cir.) (consent decree which fixed freight rates removed ability of banana grower to coerce lower freight rates from railroad and thus negated finding of monopoly power), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976).

 We hold that the district court erred in directing the jury to assume the existence of monopoly power while at the same time refusing to instruct the jury that there existed a regulatory mechanism to compel interconnection. The regulatory procedure was directly relevant to Bell's power to exclude competition. Undoubtedly, section 201(a) must be taken into account in any consideration of Bell's decision on interconnection. *See* Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559, 573–74 (1977). Whether Bell possessed sufficient power to exclude competition in light of section 201(a) is a question for the jury's consideration. Accordingly, the district court should have instructed the jury on the applicable regulatory provision pertaining to interconnection and on the jury's duty "to take into account the unique federal and state regulatory restraints." Thus the jury should have been permitted fairly to resolve the issue of Bell's alleged monopoly power. The court's failure to do so constituted reversible error.

### b. Regulation and Misuse of Monopoly Power

 Mere possession of monopoly power does not violate the antitrust laws. *Grinnell, supra*, 384 U.S. at 571, 86 S.Ct. at 1704; *Berkey, supra*, 603 F.2d at 273. Thus, even if the jury should find that Bell possessed monopoly power, liability under Sherman Act section 2 exists only if the jury finds that Bell abused its monopoly power by acting "in an unreasonably exclusionary manner" relative to its competitors. *Byars v. Bluff City News Co.*, 609 F.2d 843, 853 (6th Cir. 1979). WTC's position is that Bell's refusal to interconnect constituted such an abuse. Bell responds that the fact of regulation is relevant to the jury's decision whether the refusal was reasonable. Accordingly, Bell also argues that the district court erred in failing to instruct the jury to consider the impact of regulation in assessing whether Bell's conduct constituted a misuse of monopoly power.

 As a general rule, a company has the right to deal with whomever it chooses. *Associated Press v. United States*, 326 U.S. 1, 14–15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013 (1945). This right is limited when the company possesses a monopoly because the danger exists that it may use its monopoly position to decrease competition in other markets by refusing to deal with competitors. Accordingly, courts have held that in certain instances a monopolist's refusal to deal violates the antitrust laws. *See, e. g., Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *United States v. Terminal Railroad Association*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.*, 194 F.2d 484 (1st Cir.), *cert. denied*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952).[12]

---

**12.** Refusals to deal by a monopolist have been analyzed under two somewhat different approaches. Note, *Refusals to Deal by Vertically Integrated Monopolists*, 87 Harv.L.Rev. 1720,

This court has considered competitor's claims challenging a monopolist's refusal to deal. In *Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir. 1970), *cert. denied*, 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971), a vertically integrated producer-distributor of motion picture advertising accessories allegedly used its monopoly position in the production market to obtain a monopoly in the Atlanta distribution market by refusing to deal with local distributors. We affirmed the judgment against the monopolist since it was clear that it had "intentionally used" its monopoly power and that its refusal could not be "defended on the ground that it was only the exercise of legitimate business judgment." *Poster Exchange, supra*, 431 F.2d at 339. Similarly, in *Six Twenty-Nine Productions, Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478 (5th Cir. 1966), an advertising agency claimed that the only television station in town improperly refused to accept ads from the agency. The station defended its actions on the ground that the refusal to deal was based upon certain advertising standards created by the station for legitimate business reasons. The court reversed a grant of summary judgment in favor of the station and stated that "[i]t is clear that the complaint is sufficient if the refusal of defendant to accept advertising from plaintiff by setting up unreasonable standards or by adopting an arbitrary course of action is for the purpose of destroying plaintiff as an agency and thereby furthering a course toward monopolization." *Six Twenty-Nine, supra*, 365 F.2d at 483. The court recognized that the issue of

the station's intent was the most important fact inquiry, and further acknowledged that the reasonableness of the advertising standards was "a key factor in determining whether the Station had the intention of eliminating the competition of the plaintiff agency." *Six Twenty-Nine, supra*, 365 F.2d at 486.

■■■ As both *Poster Exchange* and *Six Twenty-Nine* make clear, a monopolist is not liable simply by refusing to deal, but may in appropriate situations present valid justifications for its actions. *See, e. g., United Brands, supra*, 532 F.2d at 239–40 (monopolist could not be held liable for closing its plant, and thereby refusing to deal with local railroad, since closing was justified by the fact that the plant was losing money); *Packaged Programs, Inc.' v. Westinghouse Broadcasting Co.*, 255 F.2d 708 (3d Cir. 1958) (factual issue existed whether monopolist television station's refusal to accept competitor's film was based on valid business judgment); *Gamco, supra*, 194 F.2d at 487–88 (denial of access to commercial building would have been justified in certain situations). *See also E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972) (existence of objective business reasons justified concerted refusal to deal), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125 (D.Mass.1959), *modified*, 284 F.2d 582 (1st Cir. 1960) (monopolist's conduct tested under "fairness" approach which includes con-

1732–51 (1974). The first approach focuses on the monopolist's intent in refusing to deal. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). *See also United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The second approach to the problem of a monopolist's refusal to deal is the so-called "bottleneck" theory. Under this approach, a monopolist who controls a "facility or resource that is essential to competitive viability in the marketplace must grant access to it on reasonable terms to [its] competitors." Watson & Brunner, *Monopolization by Regulated "Monopolies": The Search for Substantive Standards*, 22 Antitrust Bull. 559, 571

(1977). *See, e. g., United States v. Terminal Railroad Association*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (group of railroad companies acquiring essential transportation facility and denying access to competitors); *Associated Press v. United States*, 326 U.S. 1, 14–15, 65 S.Ct. 1416, 1422, 89 L.Ed. 2013 (1945) (news agency's rules denying membership to competitors of existing members). While in theory there exist differences between the two approaches, in practice the theories are similar. *Byars v. Bluff City News Co.*, 609 F.2d 843, 856 (6th Cir. 1979).

sideration of industry practices), *cert. denied*, 365 U.S. 833, 81 S.Ct. 747, 6 L.Ed.2d 201 (1961). Thus, as a general principle, section 2 prohibits only those refusals to deal which under the particular circumstances of a case are unreasonably anticompetitive. *Byars, supra*, 609 F.2d at 860.[13]

Therefore, the question is whether this principle of antitrust law permits consideration of regulation in assessing the reasonableness of Bell's actions.[14] It is undisputed that the district court instructed the jury that it may consider "legitimate telephone business reasons" for Bell's actions. Bell contends, however, that the failure to instruct the jury to consider regulatory reasons for its actions was error. Indeed, throughout the proceedings in this case Bell states that its primary justification for refusing interconnection with WTC was its belief that interconnection was contrary to the public interest as defined in section 201(a) because it would result in duplication of facilities in The Woodlands area. Bell contends that many of its statements and actions concerning its refusal to interconnect cannot be understood properly without consideration of the regulatory scheme.

We hold that the district court also erred in failing to instruct the jury that it could consider the effect of regulation in ascertaining whether Bell willfully misused its monopoly power. This holding is based on the structure and effect of

section 201(a) under which the FCC, upon appropriate demand, is empowered to determine whether a particular interconnection is in the public interest. The FCC's inquiry is controlled by its consideration of the public interest as informed by the general concerns of the Communications Act and prior adjudicatory decisions under section 201(a). As previously noted, it is possible that in certain situations, interconnection will not be in the public interest. Thus the FCC has refused interconnection in several cases, e.g., *Oklahoma-Arkansas Telephone Co. v. Southwestern Bell Telephone Co.*, 6 FCC 809 (1939); *Western Union Telegraph Co.*, 17 FCC 152, 174–75 (1952). *See also In the Matter of AT&T*, 67 FCC 2d 1455, 1472–80 (1978), *rev'd on other grounds sub nom. MCI Telecommunications Corp. v. FCC*, 580 F.2d 590 (D.C.Cir.), *cert. denied*, 439 U.S. 980, 99 S.Ct. 566, 58 L.Ed.2d 651 (1978). In those instances, public policy will be vindicated only if interconnection is denied. Prevention can occur only if the private utility denies interconnection in the first instance. Where the private concern properly denies an interconnection, it would be contrary to public policy to permit antitrust liability against it.

In the present case, we do not know if the interconnection was, in fact, in the public interest since the opportunity for FCC determination of that question was foreclosed by the withdrawal of WTC's complaint. Nevertheless, it is the antitrust

---

**13.** Analysis of the factual context in which an action allegedly in violation of the antitrust laws occurred is also important under the "rule of reason" under section 1. *See, e. g., Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918); *Neeld v. National Hockey League*, 594 F.2d 1297 (9th Cir. 1979); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Commission*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). Both Bell and WTC have expended considerable energies debating whether the "rule of reason" concept applies in section 2 cases. It is clear, however, that the analysis under section 2 is similar to that under section 1 regardless whether the rule of reason label is applied per se. *Byars v. Bluff City News Co.*, 609 F.2d 843, 860 (6th Cir. 1979).

**14.** Unlike other parts of this opinion, this issue is not determined by *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In *Otter Tail*, there existed no positive justification for the monopolist's actions, and indeed, the company did not dispute that "its purpose in refusing to deal with municipalities desiring to establish municipally owned systems is to protect itself in the position it now enjoys in the area." *United States v. Otter Tail Power Co.*, 331 F.Supp. 54, 61 (D.Minn.1971). The company engaged in other predatory practices that went far beyond a mere refusal to deal including refusals to wheel power, use of restrictive clause in various contracts, and instigating a pattern of litigation to harass municipalities. Thus, *Otter Tail* did not present a case like the present one where the utility is arguing that its actions were justified by articulable public interest factors.

court's responsibility to judge the reasonableness of Bell's refusal in light of the relevant factual context of the decision which necessarily includes consideration of the effect of regulation. Bell's position is that the refusal was not arbitrary or motivated by anticompetitive intent, but instead was proper because Bell believed that WTC's request was contrary to the public interest.[15] If Bell was correct in its assessment, and if its purpose in refusing interconnection was to vindicate the public interest, then the refusal, despite its obvious anticompetitive effect, would have been proper and entitled to protection from antitrust scrutiny. In this case, where the public interest has not been officially determined, it is no less important for the vindication of the statutory procedure that under proper instruction the jury be allowed to consider why Bell's refusal to interconnect was reasonable under the antitrust laws because it was based on articulable concerns of regulatory policy. The important issue in this case is whether Bell's action was reasonable under antitrust law in light of the relevant factors concerning the public interest standard.

■■■■■■ It is clear from the facts of this case that Bell's refusal may plausibly have been based on legitimate regulatory factors relevant to section 201(a). The difficulties presented by the construction of city-sized developments are many; indeed, commentators have speculated on a variety of constitutional problems presented by new com-

munities. See, e. g., Comment, Democracy in the New Towns: The Limits of Private Government, 36 U.Chi.L.Rev. 379 (1969). The problems raised in this case, while less theoretical, are no less significant. The Woodlands was planned as a fully integrated city developed in the midst of an existing, albeit undeveloped, portion of the metropolitan area. Prior to the emergence of The Woodlands plan, other entities had been planning for the area along more traditional lines. One such entity was Bell which had been serving developed areas within its Spring and Pinehurst exchanges for several decades, and planning for the undeveloped areas which included most of The Woodlands site. Thus, The Woodlands concept, while innovative, did not occur on land unaffected by previous planning. Both Bell and WTC had legitimate expectations regarding the area. Bell's argument that it was seeking to determine the public interest is therefore not facially implausible. Concern with duplication of service and facilities resulting in inefficient service presents a possible ground for a legitimate refusal to interconnect. We do not determine here that Bell's refusal was, in fact, reasonable, but we hold that factual issues concerning the reasonableness of Bell's actions are presented which require resolution by a jury properly instructed by the trial judge as to the relevant regulatory framework. "Failure to do so would produce misconceptions that go to the heart of the doctrine itself." Marine Bancorporation, supra, 418 U.S. at 627, 94 S.Ct. at 2873.[16]

---

15. In this regard we note the statement in plaintiff-appellee WTC's brief that "The issue of regulation was relevant for the jury only insofar as it reflected Bell's intent or motive in denying the interconnection." (WTC's brief pp. 51–52.)

16. Even granting that the district court erred in failing to instruct on the nature of regulation, WTC contends that the omission was harmless error. We reject that argument. The question on appeal is not whether an instruction was faultless in every respect, but whether the jury, considering the instruction as a whole, was misled. *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 300 (5th Cir. 1978); *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 728 (5th Cir. 1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976).

Thus, only in those cases where the reviewing court has a substantial doubt whether the jury was fairly guided in its deliberations should the judgment be disturbed. *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 (5th Cir. 1979). WTC argues that the failure to instruct on the nature of regulation was harmless because Bell presented evidence on regulation during trial and discussed the effect of regulation during its closing argument. Moreover, WTC asserts that the district court's instruction that liability could not be found if the jury believed that Bell "refused to interconnect for legitimate telephone business reasons," was sufficiently broad to include consideration of regulation. We disagree.

The failure to instruct on the impact of regulation is too central to be harmless error. Bell's

*V. Damages*

Since this case is being remanded for a new trial we need not consider all the parties' contentions with respect to the damage phase of the lawsuit, but we discuss certain points which should be considered on retrial.

In response to the special interrogatories, the jury found that the amount which would fairly and reasonably compensate WTC for injury to its business or property caused by Bell was the sum of $18,369,827. This was the exact amount which plaintiff WTC sought in the case and which its expert, Pat Loconto, of Touche Ross & Company testified were its lost profits. (PX 261.) Examination of exhibit 261 discloses that WTC's total net profit before deduction for federal income taxes for the 27-year period selected by it amounted to $70,308,996. This sum discounted to present value totaled $18,369,827.

The ultimate treble damage award of $55,109,481 is striking in view of the circumstances. WTC was a newly founded company with no record of sales or profits, and was organized to provide independent telephone services in an area not yet built. It was formed with an initial capital of $251,000. Mitchell and Mid-Texas each put up $500, a total of $1,000, to purchase the capital stock of the newly formed WTC. Mid-Texas then purchased $250,000 of preferred stock. Of the total initial capital only $120,000 in unrecoverable funds was spent by WTC. However, Mitchell would be entitled to one half of the $55 million judgment for damages in this case on an investment of $500.

■ It was error for the district judge to instruct the jury that in considering plaintiff's damage model, "you may assume" that WTC had proved it would enjoy

a monopoly and be the only telephone company in The Woodlands for the 27-year period of time selected in assessing future damages. The district court's instruction to the jury in that regard reads as follows:

In determining WTC's lost profits, you may assume that WTC's and Southwestern Bell's roles would have been reversed, so that WTC, instead of Southwestern Bell, would have been and would continue to be the only company providing telephone service to that portion of The Woodlands that has been and will be in the future served by Southwestern Bell.

R. at 631. Whether it might be "assumed" that WTC would be the only company serving The Woodlands was a strongly disputed fact according to the evidence presented by the parties. Bell maintained throughout that most of The Woodlands area was situated in its Spring and Pinehurst exchanges, that its published tariffs to that effect were disclosed before the concept of The Woodlands was announced. Further, Bell showed that it intended to serve The Woodlands area and already was providing service to 2,000 subscribers immediately around The Woodlands site when the interconnection controversy developed. While it is true that WTC sought a monopoly in The Woodlands without competition, it is far from certain that its proof showed that it could have accomplished this objective. In instructing the jury that "you may assume" that WTC would be the only telephone company in The Woodlands the district court did not give due consideration to the evidence of record and its instruction was erroneous.[17]

In addition, WTC's damage model arbitrarily selected a 27-year period to develop

presentation of evidence on regulation and discussion during closing argument cannot in and of itself justify the district court's failure to provide guidance on the issue for without specific instruction the jury has no indication how such evidence was to be used in its deliberations. To hold otherwise would be to abrogate the district court's duty to instruct the jury accurately.

17. The charge was obviously ambiguous and confusing as the chambers conference colloquy between the court and counsel reveals. Though requested by Bell's counsel to do so, the district judge declined to delete the charge in what was a critically important portion of his instructions. It is even possible under the language of the charge that the jury may have believed that it was being told to assume the WTC monopoly. (See Tr. 3484–3488.)

future profits.[18] It was based on an erroneous concept of future damages. The total net profits reflected in the model showed no deduction for federal income taxes.[19] Significantly, at least 25% of the conjectured future profits of WTC are shown to have occurred in the last four years of the 27-year period. (See PX 261.) On retrial, these errors can be avoided by proper instruction to the jury on the issue of the respective, competitive rights of WTC and Bell to serve The Woodlands and on the propriety of the submission of a credible damage model.

REVERSED AND REMANDED FOR A NEW TRIAL.

**18.** The transcript discloses that the expert witness chose the cutoff year of 1999—a 27-year period—at the direction of plaintiff's counsel. Tr. 2325–2327.

**19.** Though plaintiff's exhibit 261 shows net profits *before* federal income taxes and is the predicate for the jury's $18 million verdict, plaintiff's exhibit 265 discloses by years on the bottom line Net Income (Loss) *after* deduction for federal income taxes. Obviously a net profits total after income taxes would be substantially lower than that shown in exhibit 261. Cf. *Norfolk & Western Ry. Co. v. Liepelt,* —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) for the Supreme Court's most recent pronouncement on the propriety of considering income taxes in damage awards.