**WOODLANDS TELECOMMUNICA-TIONS CORPORATION, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELE-GRAPH COMPANY and Southwestern Bell Telephone Company, Defendants.**

Civ. A. No. 73–H–1577.

United States District Court,
S. D. Texas,
Houston Division.

March 9, 1978.

known as the Woodlands, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. Defendants have filed a motion to dismiss for failure to state a claim upon which relief can be granted. Defendants contend that this case should be dismissed for two reasons: (1) their conduct is immune from the antitrust laws because of regulation by the Federal Communications Commission (FCC) under the authority granted by the Communications Act of 1934, 47 U.S.C. § 151, *et seq.*; and (2) under the doctrine of primary jurisdiction, the FCC is the proper forum to decide the issues involved. The court concludes that under the facts as alleged in the first amended complaint, defendants are not immune from the antitrust laws and the doctrine of primary jurisdiction is not applicable. Accordingly, the motion to dismiss is denied.

In considering a motion to dismiss for failure to state a claim, the allegations of the complaint are accepted as true. *Mann v. Adams Realty Company, Inc.,* 556 F.2d 288 (5th Cir. 1977). For the purposes of this motion, the facts which are recited and accepted as true are those alleged in plaintiff's first amended complaint.

George D. Byfield, McGinnis, Lochridge & Kilgore, Austin, Tex., for plaintiff.

Walter E. Workman, Baker & Botts, Houston, Tex., for S.W. Bell.

Louis B. Paine, Jr., Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for Energy & Dev. & Woodlands Dev.

James M. Shatto, Houston, Tex., of counsel, for defendants.

*Memorandum Opinion and Order*

SINGLETON, District Judge.

Woodlands Telecommunications Corporation (WTC) filed this suit charging that defendants Southwestern Bell Telephone Company (Southwestern Bell) and American Telephone and Telegraph Company (AT&T) combined and conspired to monopolize the telephone business at a new community development north of Houston, Texas,

*Facts Alleged*

In 1971–72, Mitchell Energy and Development Corporation (Mitchell) planned a new community development to be located north of Houston, which was to be known as Woodlands. Mitchell acquired 18,000 acres of previously uninhabited land for this community. The project was to be developed by a Mitchell subsidiary, Woodlands Development Corporation (Woodlands Development). It was envisioned this new community to reach a population of 150,000 over a twenty-year period.

There was no existing telephone service for this area; however, Southwestern Bell had announced that it would provide service to this area. Mitchell and Woodland Development met with representatives of several companies, including Southwestern Bell, which had expressed an interest in providing telephone service to the new develop-

ment. The developers eventually chose the proposal made by Mid-Texas Communications Systems, Inc. (Mid-Texas) for telephone service for the Woodlands. Mid-Texas operates telephone companies in several towns in Central Texas and around Houston, Dallas, and San Antonio. Mid-Texas proposed that Mitchell and Mid-Texas form a new corporation, WTC, which, with Mid-Texas' funding and operational expertise, would provide telephone service to the Woodlands. Mid-Texas and Mitchell each owned 50 percent of the stock of WTC.

AT&T, along with Southwestern Bell and other AT&T subsidiaries, are frequently referred to as the Bell System. Each of the operating companies is an independently organized corporation providing local telephone service in one or more states. AT&T itself does not provide local telephone service, but, through its Long Lines Department, furnishes interstate telephone service to its operating companies. Each operating company connects with the facilities of other telephone companies, including non-Bell System companies and the Long Lines Department of AT&T to provide long-distance telephone service.

The Bell System assigns NNX codes for each area of the United States. The NNX code is the first three digits of all telephone numbers. In order for any telephone company to begin service, there must be an NNX code assignment for its service area and its facilities must be interconnected to those of the Bell System.

The first amended complaint alleges that AT&T and Southwestern Bell wanted the telephone business at the Woodlands and wanted to prevent a competitor, namely WTC and Mid-Texas, from having that business. After learning that the developers had chosen the Mid-Texas proposal, AT&T and Southwestern Bell engaged in a course of conduct designed to prevent WTC and Mid-Texas from providing telephone service to the Woodlands. Southwestern Bell, therefore, refused to assign an NNX code for the Woodlands area and refused to interconnect with WTC.

There was no state agency in the state of Texas at this time which regulated telephone operations so by refusing to assign NNX codes and by refusing to interconnect, Southwestern Bell could exclude any other telephone companies it chose from competing with it. However, a telephone company could file a complaint with the FCC under 47 U.S.C. § 201(a) [1] and the FCC could compel interconnection by Southwestern Bell. Such interconnection would be with respect to interstate lines only. With respect to intrastate interconnection, a telephone company would have to bring an action in the Texas state courts to require interconnection.

To thwart these efforts by WTC, the complaint alleges that AT&T and Southwestern Bell determined that delaying any interconnection orders could effectively prevent WTC from providing the necessary telephone service for the Woodlands. Because of its loan commitments, the developer of the Woodlands could not allow for a delay in telephone service. If WTC was delayed in providing telephone service, the Woodlands would have no alternative but to turn to Southwestern Bell for service. It is alleged that Southwestern Bell was successful in delaying action by the FCC by using bad faith procedural maneuvers.

Southwestern Bell also prevented attempts by WTC to provide temporary interconnection. WTC attempted to provide temporary telephone service through interconnection with telephone companies other than Southwestern Bell. Southwestern Bell prevented such interconnection,

---

1. § 201. Service and charges

    (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

through economic coercion exerted on the other telephone companies.

After all efforts for temporary service were exhausted and action by the FCC had been delayed so that any WTC telephone service could not keep pace with the Woodlands' development schedule, WTC and Mitchell conceded that Southwestern Bell had been successful in preventing anyone other than a Bell System company from providing telephone service to the Woodlands. Accordingly, Mitchell contacted Southwestern Bell to see if it would provide the necessary telephone service. Southwestern Bell agreed to provide such service on the condition that the complaint that had been filed by WTC with the FCC be withdrawn. Because of this ultimatum, the complaint was withdrawn. Southwestern Bell is now providing telephone service to the Woodlands.

*Antitrust Immunity*

■ The first question which must be addressed is whether the FCC's jurisdiction over the telephone companies under the Communications Act has preempted this court's jurisdiction under the antitrust laws to decide the instant case. The Communications Act does not expressly exempt the telephone companies from the antitrust laws so the issue is whether the Act provides implied immunity. Whether a regulatory scheme implicitly immunizes regulated activities and organizations from the antitrust laws depends upon the nature of the particular agency and statutes in question. Cases dealing with other agencies and statutes cannot be controlling in this case, but are helpful in determining what questions are relevant. It is necessary to analyze the scope and history of the regulatory scheme to determine whether the particular antitrust challenge alleged here can be reconciled with the regulatory scheme.

This analysis involves two distinct inquiries. First, it may be asked whether, by enacting a particular statute governing specific conduct, Congress intended that conduct to be controlled solely by the regulatory agency. This was the inquiry in *Gor-*

*don v. New York Stock Exchange, Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), where the Supreme Court found that under section 19(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78s(b), Congress intended to leave the supervision of the fixing of reasonable rates of commission to the Securities and Exchange Commission. The court held that the antitrust laws were inapplicable since they would bar fixed commission rates which would preclude and prevent the operation of the Securities Exchange Act as intended by Congress.

If Congress intends conduct to be controlled solely by a regulatory agency, there is an irreconcilable conflict between the regulatory statute and the antitrust laws. Defendants argue that such a conflict exists by reason of section 201(a) of the Communications Act, 47 U.S.C. § 201(a). Under section 201(a), the FCC has the authority to order a carrier to interconnect only after the FCC has determined that the interconnection is necessary or desirable in the public interest. Defendants contend that the antitrust laws cannot apply in this instance because it would usurp the FCC's jurisdiction to determine whether interconnection is in the public interest.

■ Defendants misinterpret section 201(a). A determination of public interest by the FCC is not necessary before carriers interconnect their facilities. As opposed to a licensing statute, section 201(a) leaves the question of whether to interconnect to be decided in the normal course of business by the parties; carriers may interconnect their facilities without FCC permission or order. A public interest determination by the FCC is required only if a carrier has refused to interconnect and such refusal is challenged before the FCC.

■ A carrier's decision whether to interconnect or refuse to interconnect is a matter of business judgment which is not subject to section 201(a) unless, after a refusal, the FCC directs such interconnection. Therefore, the decision whether to voluntarily interconnect is itself not subject to

regulatory supervision. When relationships in business are not governed by regulatory supervision, but are rather the product of the business judgments of the parties, the courts should be hesitant to conclude that the antitrust laws are inapplicable. *Otter Tail Power Co. v. United States*, 410 U.S. 366, 374, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *United States v. Radio Corp. of America*, 358 U.S. 334, 351, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). Where a carrier refuses to interconnect and there has been no FCC action on the matter, the maintenance of an antitrust action does not interfere with FCC regulation. Where the FCC has acted, however, and directed a carrier to interconnect, the antitrust laws should not be used to interfere with the FCC's determination.

■ At common law, there was no duty to interconnect facilities between carriers. Section 201(a) was enacted in recognition of this fact. *Oklahoma-Arkansas Telephone Co. v. Southwestern Bell Telephone Co.*, 45 F.2d 995 (8th Cir. 1930), *cert. denied*, 283 U.S. 822, 51 S.Ct. 346, 75 L.Ed. 1437 (1931). If the refusal to interconnect is for the express purpose of excluding competition, as is alleged in this case, the antitrust laws may provide another remedy in addition to section 201(a). Whether the court is asked to order interconnection or to award treble damages, the practical effect is that the court must determine whether there should be or should have been an interconnection between the carriers. Under most circumstances, a court may consider certifying the question of whether the interconnection is in the public interest to the FCC under the doctrine of primary jurisdiction. However, under the doctrine of primary jurisdiction, as will be discussed below, the court would not lose jurisdiction and the case would not be dismissed. Rather, the final determination of the antitrust question would merely be postponed.

■ A second distinct inquiry is whether the regulatory scheme in its entirety is so pervasive that it necessarily displaces the antitrust laws. In *United States v. National Association of Securities Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), the Supreme Court, using this analysis, held that the Securities and Exchange Commission's exercise of regulatory authority under the Investment Company Act of 1940, 15 U.S.C. § 80a–1, *et seq.*, and the Maloney Act, 15 U.S.C. § 78*o*–3, was sufficiently pervasive to confer implied immunity from the antitrust law.

Repeals of the antitrust laws by implication "are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *Gordon v. New York Stock Exchange*, 422 U.S. at 682, 95 S.Ct. 2598; *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963). Immunity will be implied only if necessary to make the regulatory statutes work, and "only to the minimum extent necessary." *Gordon v. New York Stock Exchange*, 422 U.S. at 683, 95 S.Ct. at 2612.

The argument that the Communications Act is so pervasive with respect to the telephone industry that it impliedly repealed or displaced the antitrust laws was rejected in *United States v. American Telephone & Telegraph Co.*, 427 F.Supp. 57 (1976), *cert. denied*, No. 77–1009 (D.C.Cir. May 26, 1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977). This court agrees with the conclusion of Judge Waddy that "[n]either the language, nor the legislative history of the Communications Act supports the conclusion that Congress intended by the Act to grant a total, blanket immunity to defendants from application of antitrust laws, and to place exclusive jurisdiction over all their conduct in the Federal Communications Commission." *United States v. American Telephone & Telegraph Co.*, 427 F.Supp. at 61.

*Primary Jurisdiction*

■■ The doctrine of primary jurisdiction applies when a court and a regulatory agency have concurrent jurisdiction over all or part of a controversy and determines

whether the court or the agency should make the initial decision. The doctrine does not allocate power between courts and agencies, but governs only whether the court or agency will initially decide the particular issue. A determination that an agency has primary jurisdiction does not necessarily mean that the court will refrain from deciding the case; the court's jurisdiction is not ousted by primary jurisdiction, but is only postponed. *United States v. Philadelphia National Bank*, 374 U.S. at 353, 83 S.Ct. 1715, 10 L.Ed.2d 915; 3 K. Davis, Administrative Law Treatise § 19.01 at 3 (1958). Accordingly, a determination to invoke the doctrine of primary jurisdiction will not result in dismissal of a case but will only involve a staying of further action until the questions certified to the administrative agency have been resolved.

A case involving interconnection between carriers will frequently give rise to the question of whether such interconnection will be in the public interest. Congress, through section 201(a), has indicated that the FCC should determine this question. Therefore, in most antitrust cases based on one carrier's refusal to interconnect with another, the question of whether such interconnection would be in the public interest should be referred to the FCC for initial determination. Following resolution of this question, the court would then determine the antitrust issues.

If plaintiff was seeking an order from this court compelling defendants to interconnect, the case would definitely call for referral to the FCC. In most instances, the seeking of treble damages rather than injunctive relief would not alter the referral to the FCC since the threat of treble damages as a practical matter may achieve the same result as injunctive relief. However, for two reasons, referral of this case to the FCC under the doctrine of primary jurisdiction would be improper.

First, when Southwestern Bell was contacted by Mitchell to provide telephone service to the Woodlands and began providing such service, the question of whether interconnection was in the public interest became moot. Once Southwestern Bell began providing telephone service to this area, there was no other carrier with which defendants could interconnect. The question of whether interconnection was in the public interest was moot before this antitrust suit was filed. Further, there could be no regulatory policy which could be served by this court requesting the FCC to attempt to decide issue where no current controversy exists.

Secondly, the question of whether defendants should be ordered to interconnect with plaintiff's facilities was before the FCC, and therefore the question of whether interconnection was in the public interest was also before the FCC. The complaint alleges, and for the purposes of this motion such allegation is accepted as true, that the defendants, acting in bad faith, prevented the FCC from determining these issues. The conduct which is alleged to have violated the antitrust laws includes defendants' actions in preventing plaintiff's access to the administrative remedies of the FCC. Because the refusal to interconnect forms only a portion of the antitrust violations complained of herein, referral of the interconnection issue to the FCC is not required.

Defendants, citing *Noerr*,[2] *Pennington*,[3] and *California Motor Transport*,[4] assert that their resort to the FCC in opposing plaintiff's complaint under section 201(a) cannot violate the antitrust laws even if their motive for so doing was anticompetitive. While resort to governmental processes does not violate the antitrust laws, attempts to bar one's competitor's meaningful access to administrative agencies or the courts is not immune from anti-

2. *Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

3. *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

4. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

**1268**

trust legislation. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511–12, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The complaint here alleges bad faith abuse of the administrative process so defendants do not have protection under the *Noerr-Pennington* doctrines.

Therefore, premises considered, it is ORDERED that defendants' motion to dismiss be, and the same is hereby, DENIED.