**TOTAL TELECOMMUNICATIONS SERVICES, INC., and Atlas Telephone Company, Inc., Plaintiffs,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH CO., Defendant.**

**Civ. A. No. 95–2273.**

United States District Court, District of Columbia.

March 5, 1996.

David R. Kuney, David, Hagner, Kuney & Krupin, P.C., Washington, DC, for plaintiff.

Peter D. Keisler, James F. Bendernagel, David L. Lawson, Washington, D.C., for defendant.

## Memorandum Opinion

URBINA, District Judge.

**Granting Defendant's Motion to Refer this Case to the Federal Communications Commission;[1] Denying Plaintiffs' Motion for a Preliminary Injunction; and Denying Plaintiffs' Application for a Temporary Restraining Order[2]**

This matter comes before the court upon defendant's motion to refer this case to the Federal Communications Commission (FCC); plaintiffs' motion for a preliminary injunction; and plaintiffs' application for a temporary restraining order. After considering the submissions, the court concludes that referral to the FCC is appropriate pursuant to the doctrine of primary jurisdiction. Furthermore, so as not to encroach upon FCC's primary jurisdiction by expressing a view as to the underlying merits of the present action, the court will not entertain plaintiffs' request for injunctive relief. Finally, the court concludes that holding this action in abeyance pending agency resolution of the underlying issues is rendered inappropriate by the circumstances of the case.

### I. Background

■ TTS asserts that it is a competitive access provider located in Big Cabin, Oklahoma.[3] It provides local terminating services, the last link in a long-distance telephone call, to common carriers of interstate communications, such as AT & T. Long-distance carriers do not provide originating or terminating services and are thus dependent upon local telephone companies for those services. TTS provides only interstate services for the termination of calls placed by subscribers of AT & T to an end user served by TTS. TTS does not provide local telephone service to its customers. TTS's sole end user at this point is Audiobridge.[4]

Between August 1, 1995 and November 21, 1995, TTS provided terminating services but no originating services to AT & T. TTS provides its services pursuant to the rates, terms, and conditions of its tariff filed with the FCC on July 31, 1995. The tariff took effect on August 1, 1995. Pursuant to this tariff, TTS seeks to charge long-distance carriers with access fees for providing its terminating services. TTS leased access service from Atlas Telephone Company (Atlas), the other plaintiff in this case.[5] Under the arrangement, Atlas and TTS jointly provide the access service ordered by AT & T and each bills AT & T for its services.

Atlas is a local telephone exchange monopoly located in Big Cabin, Oklahoma, where it owns and controls the telephone lines of service users in that location. Atlas provides originating services, the first step in the communications chain of a long-distance call placed by one of the users served by Atlas. Atlas also provides terminating services to its customers when they receive a long-distance

---

1. The court grants AT & T's motion for leave to file a consolidated memorandum incorporating both its opposition to plaintiffs' motion for a preliminary injunction and its motion to refer this case to the FCC; and plaintiffs' motion for leave to file a second amended complaint.

2. Preliminarily, the court notes that the parties jointly moved the court to enter a proposed briefing schedule. The court granted the motion and adopted the proposed schedule. Pursuant to the schedule, the briefing of all the relevant issues was to be completed by January 23, 1996. However, the partie continued to inundate the court with unnecessary filings until February 7, 1996. The parties requested in their motion that a hearing be held on January 26 or January 30, 1996 or any time thereafter that was convenient to the court. However, after evaluating the voluminous submissions of the parties, the court determined, as is the preference in this jurisdiction, that the outstanding motions should be resolved on the papers.

3. Competitive access providers are entities that provide access services in competition with monopoly local exchange carriers. These types of carriers are categorized as non-dominant because they lack the market power of dominant carriers. Dominant carriers, on the other hand, are those that possess market power. 47 C.F.R. § 61.3(*o*).

4. Audiobridge is an entity that provides a multiple voice bridging service that allows multiple members of the public to engage in simultaneous conversations and thus AT & T's reference to TTS's enterprise as constituting a "chat line."

5. The court grants TTS's motion for joinder of parties in the motion for preliminary injunction. Atlas is thus incorporated in the present action as a plaintiff.

telephone call. Since Atlas is the local monopoly, its rates are regulated. Long-distance carriers purchase access to Atlas's originating and terminating services. AT & T has purchased and continues to purchase access service from Atlas.

AT & T admits that it completed many long-distance telephone calls to TTS's end user. As a consequence of the increased traffic resulting from TTS's operations, AT & T requested that Atlas provide additional carrying capacity into Big Cabin. TTS argues that such a request was in effect an order of TTS's services. AT & T disputes this conclusion. TTS further asserts that under its tariff and standard industry practice, it has the authority and the right to charge AT & T as a result of Atlas' extension of access service to TTS. Thus, TTS contends that AT & T is automatically liable to TTS for its services upon TTS notifying AT & T of the change in the billing arrangement between AT & T and Atlas. TTS states that it notified AT & T of the changed billing arrangement by letter dated August 4, 1995. From August to November 1995, TTS billed AT & T approximately $800,000 for such services. TTS argues that AT & T is bound to honor TTS's tariff and that AT & T must provide long distance service to telephone numbers served by TTS.

TTS and Atlas have a highly intertwined relationship. Plaintiffs do not dispute the fact that the president of the latter is also the chairman of the former. TTS has obtained some of the facilities of Atlas to provide terminating services. Although TTS terms itself a competitive access provider, it does not specify how it competes with Atlas. The charges AT & T must pay TTS are in addition to those that the long-distance carrier must pay to Atlas for terminating services for the same telephone calls. Thus, according to AT & T, this arrangement has multiplied by a factor of ten the access charges that must be paid by the long-distance carriers. In effect, AT & T's position is that if the current operating structure of Atlas and TTS is allowed to persist, long-distance carriers will be forced to pay duplicative access charges. The result would be, AT & T contends, that it would end up losing money on many telephone calls.

AT & T maintains that the arrangement entered into by TTS and Atlas violates two sets of FCC regulations. First, AT & T contends that TTS is in reality operating a "chat line," that is a pay-per-call 900 number service, which must conform to detailed FCC regulations. By devising the present operating structure, AT & T argues, plaintiffs are attempting to evade these regulations by providing a pay-per-call type of service but shifting the cost from the customer to the long-distance carriers. This is so because the customer pays the normal long-distance rates and the plaintiffs extract the profits via the duplicative access fees charged to the long-distance carriers.

Second, AT & T takes issue with the creation of TTS as a second company and the latter's claims to be a competitive access provider. According to AT & T, plaintiffs have consummated this arrangement in order to avoid the rate regulations that are applicable to Atlas as a dominant carrier. These regulations include one that requires dominant carriers to charge cost-based rates and to file tariffs specifying their rates at least forty-five days before they take effect. This requirement is imposed by the FCC so that it may investigate and if necessary suspend or reject those rates if they are unreasonably high or otherwise are not legal. 47 C.F.R. § 61.58(c)(1). Competitive access providers, which lack the market dominance of a dominant carrier, are permitted to file tariffs on one-day's notice and the tariffs are presumed lawful by the FCC.

AT & T therefore asserts and plaintiffs agree that the current dispute presents issues that are of significant importance to carriers, their customers, and the telephone industry in general.[6] This is the case because access charges are the single biggest cost associated with the provision of long-distance service. Moreover, AT & T asserts and plaintiffs do not dispute, that arrange-

---

6. AT & T's Consolidated Memorandum in Support of AT & T's Motion to Refer this Case to the FCC and in Opposition to Plaintiffs' Motion for a Preliminary Injunction at pp. 5–6 and Plaintiffs' Motion for a Preliminary Injunction at pg. 7.

ments such as the one between Atlas and TTS are beginning to appear around the country and TTS's president has indicated TTS's intention to replicate the arrangement elsewhere.

On November 22, 1995, as a consequence of its concerns, AT & T terminated its interconnection services with TTS. However, AT & T states that it continues to provide long-distance service to Big Cabin residents, not through TTS's facilities but through those of Atlas. On November 24, 1995, as a result of AT & T's termination of interconnection services, TTS moved for a temporary restraining order in the United States District Court for the Northern District of Oklahoma, seeking to have "AT & T restrained from blocking telephone calls destined for telephone numbers allegedly assigned and served by TTS which terminate at facilities operated by TTS." Order, *Total Telecommunications Services, Inc. v. AT & T* 1 (N.D.Okla. Dec. 1, 1995). The court there found that the main disputed issue pertained to the "meaning, scope, applicability, and validity of TTS's tariff as it relates to TTS's billing practices." *Id.* at 4. The court concluded that the power and duty to examine all tariffs rests with the FCC. The court thus denied TTS' application for a temporary restraining order and referred the matter to the FCC for a deter-

mination of all the issues within its jurisdiction. The court further stayed the action pending the FCC's final determination. TTS then voluntarily dismissed the action it had instituted in Oklahoma and has now filed the current action, presenting substantially the same issues, in this jurisdiction.

## II. Doctrine of Primary Jurisdiction

Plaintiffs have presently moved for a preliminary injunction, seeking this court to order AT & T to provide long distance service to TTS's customers. Plaintiffs also seek to have the court order AT & T to pay for past and future services.[7] TTS contends that AT & T's refusal to furnish service violates Sections 201(a); 202, and 214 of the Communications Act of 1934, 47 U.S.C. § 151 et seq. and Section 251 of the 1996 Act (Communications Act).[8]

The issues to be resolved in this case involve questions relating to: (1) whether AT & T must interconnect its services to those of TTS; (2) the validity of TTS's tariff and practices; (3) whether AT & T discontinued service in violation of Section 214; (4) whether AT & T engaged in discriminatory conduct and whether TTS is properly categorized as a competitive access provider. There are also underlying policy issues implicated by plaintiffs' operating structure in this case.

---

7. The court notes that his latter request was made in plaintiffs' reply memorandum in support of their motion for a preliminary injunction. The court does not rule on the propriety of making new requests for injunctive relief in a reply. However, plaintiffs should have specified the entirety of their request in the original motion so as to provide AT & T with sufficient notice.

8. Section 201(a) provides, in pertinent part,

It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers. 47 U.S.C. § 201(a).

Section 214(a) provides, in pertinent part,

No carrier shall discontinue, reduce, or impair service to a community, or to part of a community, unless and until there shall first have been obtained from the Commission a certificate that neither the present nor future public con-

venience and necessity will be adversely affected thereby . . . 47 U.S.C. § 214(a).

Section 202 provides that,

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class or persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. 47 U.S.C. § 202.

Lastly, in their application for a temporary restraining order filed subsequent to plaintiffs' motion for a preliminary injunction, plaintiffs allege that AT & T is violating Section 251(a)(1) of the Communications Act of 1996. That section provides that,

(a) each telecommunications carrier has the duty—

(1) to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers. 47 U.S.C. § 251(a)(1).

The resolution of these issues involve policy considerations concerning the public interest and technical questions relating to TTS's tariff and operating structure, that the Communications Act has vested the FCC with the mandate to determine. The FCC has broad authority to evaluate both prices and terms of proposed rates, it can investigate existing ones, and if necessary, prescribe alternatives. Its supervisory powers extend to a carrier's "charges, practices, classifications, and regulations." 47 U.S.C. § 201(b). The term "carriers" includes both long-distance companies and local exchange monopolies, such as Atlas. 47 U.S.C. § 153(h). Moreover, the FCC may control which carriers compete, where, and under what corporate structures. The powers granted to the FCC are a reflection of Congress' intention that one governmental entity be vested with the responsibility of developing, coordinating and enforcing a uniform telecommunications policy. *See Chastain v. AT & T*, 351 F.Supp. 1320, 1322 (D.D.C. 1972).

As a result of the Commission's mandate and pursuant to the primary jurisdiction doctrine, the FCC is the entity best suited to make the initial determination of the issues presently before the court. "Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset, but it is likely that the case will require resolution of issues, which, under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989). The primary jurisdiction doctrine is premised on a desire for uniform outcomes and on the inherent advantage in allowing an agency, in this case the FCC, to apply its expert judgment to the issues in dispute. *See Texas & Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 441, 27 S.Ct. 350, 355–356, 51 L.Ed. 553 (1907); *United States v. Western Pacific, R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–304, 96 S.Ct. 1978, 1986–1987, 48 L.Ed.2d 643 (1976); *Allnet Communication Service v. NECA*, 965 F.2d 1118, 1120 (D.C.Cir.1992).

The agency's expertise is not limited to technical matters, but extends to the agency's mandate to implement, in this case the Telecommunications Acts of 1934 and 1996, and the concomitant policy judgments it must make. *Western Pacific, R.R.*, 352 U.S. at 65, 77 S.Ct. at 165–166. Were the district courts to make the initial determinations of the issues involved in this case, one of the premises of primary jurisdiction could be infringed. That is, different courts may resolve the regulatory issues before them in an inconsistent manner thereby producing disparate results. "The doctrine of primary jurisdiction has been developed by the courts in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court." *MCI Communications Corp. v. AT & T*, 496 F.2d 214, 220 (3d Cir.1974).

Courts may consider additional relevant factors when evaluating the appropriateness of invoking the primary jurisdiction doctrine. For example, "whether the issues of fact raised in the case are not within the conventional experience of judges, or whether the issues of fact require the exercise of administrative discretion; or require information and consistency in the regulation of the business entrusted to a particular agency." *Marshall*, 874 F.2d at 1377 (internal citations omitted). Furthermore, the primary jurisdiction doctrine may be applicable even if the questions raised in a case are within the ordinary experience of the judiciary. *MCI Communications Corp.* 496 F.2d at 223; *see also AT & T v. MCI Communications Corp.*, 837 F.Supp. 13, 16 (D.D.C.1993) (identifying four factors: (1) whether the question at issue is within the conventional experience of judges; (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise; (3) whether there exists a danger of inconsistent rulings; and (4) whether a prior application to the agency has been made).

Importantly, the plaintiffs do not deny the fact, brought forward by AT & T, that many of the issues presently pending before the

court are already before the FCC. Specifically, in *MCI Telecommunications Corp. v. Beehive Tel. Co.*, FCC no. E–95–44, the FCC is evaluating the validity of the tariff of the Beehive Telephone Company; the tariff after which TTS's tariff was modeled. Furthermore, in the Oklahoma proceedings, counsel for plaintiff recognized that the underlying dispute had to ultimately be resolved by the FCC. Moreover, plaintiffs do not dispute the fact that they have standing to present all their claims before the FCC and thereby obtain whatever relief they are entitled to. *See Western Union Tel. Co. v. Graphic Scanning Corp.*, 360 F.Supp. 593, 596 (S.D.N.Y. 1973). Additionally, the court notes that Sprint is also refusing to provide interconnection services to TTS. It is apparent that long-distance carriers are concerned about the operating structure of entities like TTS. Referral would therefore be appropriate in this case. *See Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1038–1040 (10th Cir.1993).

In addition, on January 23, 1996, TTS filed a petition before the FCC in which it lodged the same allegations against AT & T as in the present lawsuit. In that petition, TTS seeks to have the FCC reconsider its decision to classify AT & T as a non-dominant carrier. In that proceeding, TTS alleges that, "AT & T unlawfully blocked TTS's calls from being completed to TTS's end users. Furthermore, AT & T took this action in violation of Section 214(a) of the Communications Act ...". Total Telecommunications Services, Inc., Petition for Reconsideration, CCB Pol 95–25. In evaluating the merits of TTS's petition, the FCC will have to consider the lawfulness of AT & T's actions; the same exercise plaintiffs request the court to presently pursue.

## A. Interconnection of Services

■ The central claim in this case, as the court views it, is whether TTS has the right and AT & T the concomitant obligation, to interconnect its services to those of TTS.[9] The Communications Act does provide that such interconnections can be ordered, but only by the FCC. 47 U.S.C. § 201(a). Thus the question becomes whether AT & T must interconnect its services with those of TTS upon the latter's request. Such a question should be addressed by the FCC. *See, e.g., MCI Telecommunications Corp.*, 496 F.2d at 219–223. The plain language of Section 201(a) clearly suggests that interconnection is required only when the FCC so directs it; and courts have so interpreted Section 201(a). *See e.g., So. Pac. Comm. Co. v. AT & T*, 556 F.Supp. 825, 975 (D.D.C.1983), *aff'd,* 740 F.2d 980 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Woodlands Tel. Corp. v. AT & T*, 447 F.Supp. 1261, 1265 (S.D.Tex.1978). In *So. Pac. Comm. Co.*, the court stated that "a carrier has no duty under the Communications Act to provide interconnection to another carrier." *Id.* at 975.[10] Moreover, before such an order is issued, the FCC must first

9. Plaintiffs themselves, in their application for a temporary restraining order, recognize that "the present action may be viewed as an interconnection case," to the extent Section 251 of the 1996 Communications Act may be implicated. Plaintiffs Application for a Temporary Restraining Order, at 28. An interconnection dispute, "involving, as it must, the comparative evaluation of complex technical, economic, and policy factors, as well as consideration of the public interest, should be made, in the first instance, by the administrative agency which has been entrusted with the primary responsibility for making such a determination and which has the expertise necessary for the development of sound regulatory policy." *MCI Communications Corp.*, 496 F.2d at 224.

10. The cases cited by plaintiffs for their proposition that Section 201(a) establishes an uncondi-

tional duty on the part of AT & T to interconnect its services with those of TTS are inapposite. *MCI Telecommunications Corp. v. FCC*, 765 F.2d 1186 (D.C.Cir.1985) and *MCI Telecommunications Corp. v. FCC*, 712 F.2d 517 (D.C.Cir.1983), involved MCI's challenge of an FCC directive, not the scope of Section 201 or the duties of common carriers pursuant to the same. *United States v. Western Elec. Co., Inc.*, 578 F.Supp. 668 (D.D.C.1983) and *U.S. v. Western Elec. Co., Inc.*, 569 F.Supp. 1057 (D.D.C.1983), concerned a motion for clarification of the consent decree, entered into by AT & T and the U.S. government, which reorganized the telephone system; Section 201 of the Communications Act was not addressed. Lastly, *American Trucking Ass'ns, Inc. v. Atchison, T & S Rwy. Co.*, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967), pertained to the Interstate Commerce Act, not the Communications Act.

make a finding, after a hearing, that such a result would be in the public interest. *Id.*

## B. Validity of Tariffs

 Section 201(b) declares unlawful any tariffs, rates, charges, or other practices that are "unjust or unreasonable." The FCC has primary jurisdiction over claims that tariffs and/or practices are not just or reasonable. *Ambassador, Inc. v. United States,* 325 U.S. 317, 324, 65 S.Ct. 1151, 1155, 89 L.Ed. 1637 (1945); *Chastain v. AT & T,* 351 F.Supp. 1320 (D.D.C.1972). "Given the concern for uniformity and expert judgment, it is hardly surprising that courts have frequently invoked primary jurisdiction in cases involving tariff interpretations . . . [and] compliance of a tariff with regulatory standards . . ." *Allnet Communication Service,* 965 F.2d at 1120. Questions involving standard industry practices should also be entertained by the FCC. *See Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973) (internal citations omitted).

Technical questions, as the Oklahoma court found, involving the adequacy and validity of TTS's filed tariff fall more properly within province of the FCC. Plaintiffs themselves emphasize that the focus of this litigation should be the interpretation of a tariff; albeit the one used by Atlas. The Communications Act provides that the FCC has the primary responsibility to review, interpret, and when necessary, suspend or reject tariffs that are unjust or unreasonable. It also has the authority to direct carriers to cease such practices or charges and can direct such carriers to rectify their practices and modify their charges to achieve regulatory compliance. 47 U.S.C. §§ 204, 205. TTS's assertion that its tariff is presumed valid is inconsequential. The FCC has declared that "[i]t is well settled that a tariff's becoming effective without investigation does not imply that the tariff is ultimately lawful, or that the tariffed rates were properly targeted." *Communications Satellite Corporation,* 3 FCC Rcd 2643, 2647 (1988).

Plaintiffs rely heavily on *National Comm. Ass'n v. American Tele. and Tele.,* 46 F.3d 220 (2d Cir.1995), in urging the court to deny AT & T's request for referral. In *National Comm. Ass'n,* the court declined to apply the doctrine of primary jurisdiction. However, there are important differences between that case and the present one. As the court there recognized, the issue involved was a narrow one: whether the plaintiff in that case had timely paid its bills. *Id.* at 223. The court, however, recognized that the "statutory reasonableness of a tariff should, of course, be reviewed by an agency." *Id.* Furthermore, *National Comm. Ass'n* did not involve the interpretation of a tariff or the reasonableness of the same. Perhaps more importantly, was the fact that in that case the court recognized that there was no risk of inconsistent results, a danger in the present dispute, since a controversy similar to the current one is pending before the FCC.

## C. Discontinuation of Service

 Plaintiffs claim that AT & T violated Section 214 of the Communications Act in that AT & T did not obtain authorization from the FCC prior to discontinuing service to TTS. The discontinuance requirement incorporated into Section 214 is directed "at preventing a loss or impairment of a service offered to a community or part of a community without adequate public interest safeguards." *Memorandum Opinion and Order, Western Union Telegraph Co. Petition for Order to Require the Bell Sys. to Continue to Provide Group/Supergroup Facilities,* 74 F.C.C.2d 293, 295 (1979). The FCC has found that carrier-to-carrier interconnection relationships fall within the ambit of Section 214. However, in discontinuance disputes between carriers, the FCC places primary focus on the community served, i.e., the using public or more simply put, the customers, rather than "any technical or financial impact on the carrier itself." *Id.* at 296. "Such technical or financial considerations are more appropriately considered in a proceeding involving Section 201(a), over which the FCC has primary jurisdiction." *Id.;* [11] *see also*

---

11. It is when there has been a discontinuance, reduction, or impairment of service to the carrier's customer, at which point the FCC proceeds to determine whether Section 214 has been violated. *Id.*

*ITT World Communications v. New York Tel.,* 381 F.Supp. 113 (S.D.N.Y.1974); *Southwestern Bell Telephone,* 8 FCC Rcd. 2589 (1993).

In addition, plaintiffs concede that it is the FCC which interprets the concept of "community". And there is a question as to whether customers in Big Cabin, Oklahoma, are not being provided with long-distance service by AT & T since plaintiffs do not controvert the fact that Big Cabin residents have access to long-distance services from multiple long-distance carriers. Consequently, in reality there is only one end user served by TTS that is currently being affected, Audiobridge. Accordingly, TTS would have to prove that the FCC regards this entity or the customers serviced by it as constituting a community or part thereof.

Even if the court were to frame the current dispute as an alleged unlawful discontinuation of service on the part of AT & T, as opposed to a dispute concerning the right of TTS to be interconnected to AT & T's services, referral to the FCC would nevertheless be appropriate.[12] The resolution of whether a carrier first needs to procure a certificate from the FCC under Section 214 prior to the termination of service, is a matter that should be resolved by the FCC itself, in part, since it is the agency from which the permit must be obtained. This is so, because in certain situations prior authorization for the discontinuation of service to a customer is not required. *See e.g.,* Memorandum Opinion and Order, *Pacific Telatronics, Inc. & Revisions to Tariff F.C.C. No. 4,* 74 F.C.C.2d 286, 290 (1979). It is unclear whether a Section 214 application is even required in this case because a certificate is not needed when "the adequacy or quality of service" is not impaired. 47 U.S.C. § 214(a). As referenced above, plaintiffs do not dispute the fact that customers continue to have access to their services via other long-distance carriers.[13] As a result, the FCC is the entity that should determine whether in fact there has been a violation of Section 214 in this case, since that section provides for the issuance of an injunction only upon a finding that there has been a discontinuance of service "contrary to the provisions of" Section 214.

Finally, in this action there are more important issues implicated than resolving the question of whether a rule, in this instance Section 214, was violated. *See Western Union Tel. Co. v. Graphic Scanning Corp.,* 360 F.Supp. 593, 596 (S.D.N.Y.1973) (dismissing plaintiff's Section 214 claim; denying injunctive relief request and referring claim to the FCC because plaintiff could obtain full relief by filing his complaint with the FCC). This case implicates policy questions regarding the relationship of putative competitive access providers, in this case, TTS and local exchange monopolies, such as Atlas. Inherent is these questions is the issue of whether TTS is in fact a competitive access provider and whether its tariff is valid. The FCC is better equipped to render a decision on these issues and thereby promote uniformity in the telephone industry.[14]

### D. Plaintiffs' Other Claims

Plaintiffs' contention of discrimination on the part of AT & T made pursuant to Section 202 is also more properly the province of the FCC since it is within the FCC's sole discre-

12. The court notes, however, that plaintiffs do not only raise a Section 214 claim but rather, plaintiffs' amended complaint is based on seven counts: violations of §§ 201, 202, 214 and 251; breach of contract; intentional interference with business relations; preliminary and permanent injunctive relief; and quantum meruit. However, plaintiffs' common law claims are fundamentally premised on plaintiffs' claims that AT & T must interconnect its services with TTS. Consequently, "[t]he presence of additional, subordinate claims by [plaintiffs] does not make primary jurisdiction any less suitable ... it would make little sense to refrain from applying primary jurisdiction merely because of an ancillary claim that ... would [be] reach[ed] only after examination of ones clearly within the agency's purview." *Allnet Communication Service,* 965 F.2d at 1121–1122.

13. TTS only disputes the ease with which its customer[s] can reach its services through other long-distance carriers.

14. Plaintiffs themselves allege that AT & T is violating FCC policy concerning competitive access providers. Furthermore, plaintiffs claim that AT & T through this action is seeking to establish a precedent for its continued unlawful treatment of new market entrants. The FCC is in a more suitable position than this court to determine such claims.

tion to either prescribe a remedy or to order that the carrier end the discrimination. *National Ass. of Motor Bus Owners v. FCC*, 460 F.2d 561 (2d Cir.1972); *see also Vortex Communications, Inc. v. AT & T*, 828 F.Supp. 19 (S.D.N.Y.1993). Additionally, plaintiffs' allegation, recently brought forth in their application for a temporary restraining order, that AT & T is violating Section 251 of the new Communications Act, should also be entertained by the FCC. That section states that carriers have a duty to interconnect with other carriers. The duty, however, is dependent upon a finding that TTS is a carrier. The court is disinclined to interpret the rights and duties of carriers and other parties under this section because inconsistent and disparate results might ensue. More importantly, however, is the fact that the new Act charges the FCC with the mandate to "complete all actions necessary to establish regulations to implement the requirements of this section." 47 U.S.C. § 251(d). The court therefore declines to interpret Section 251 in the first instance.

### E. Additional Public Policy Considerations

Inherent in the resolution of the issues before the court and perhaps outcome determinative is the determination of whether the operating structure such as the one being employed by the plaintiffs should be allowed to persist. Atlas is the local monopoly in Big Cabin, Oklahoma. As a monopoly it is subject to rigorous regulations. The president of Atlas apparently is also the chairman of TTS. As a result, TTS and Atlas have common officers and operating equipment. TTS holds itself out to be a competitive access provider; if it is indeed such an entity, it is subject to less stringent regulatory standards. Plaintiffs' operating arrangement thus raises important questions regarding the ability of symbiotic companies to enter into an arrangement by which they simultaneous hold themselves out to be the local monopoly and a competitive access provider. The latter is to be a competitor of the former. Without opining on these issues, the court does conclude that this subject is one that should first be entertained by the FCC.

### F. The Concern for Delay

Plaintiffs' reliance on various cases for the proposition that the doctrine of primary jurisdiction should rarely be invoked is misplaced under the circumstances of this case. The rationale for invoking the doctrine only in certain circumstances is the potential for delay and expense when the doctrine is applied. *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984) (internal citations omitted). Thus "[w]hen reaching a decision to defer [to an agency], a court must consider how long an administrative process will run before its work is done." *Rohr Industries v. WMATA*, 720 F.2d 1319, 1326 (D.C.Cir.1983). When the duration of the administrative process is short, the case for deferring to the agency is great. *Id.* In *Rohr Industries*, the court was concerned with the potential for delay because in that case the administrative process threatened to drag on for many years. Similarly, in *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474 (8th Cir.1988), the court noted that the application of the doctrine could result in the protraction of the litigation. Nevertheless, although the litigation in that case had been on-going for more than six years, the court thought it proper to apply the doctrine. Finally, in *National Comm. Ass'n*, 46 F.3d 220 (2d Cir.1995), the parties estimated that the delay resulting from referral to the FCC would be from two to five years. In this case, the FCC would be required by statute to issue a final decision within a year of the filing of a complaint; or in exceptional cases, within fifteen months. 47 U.S.C. §§ 208(b)(2), 201(b).

The present litigation has been on-going for only several months. Moreover, plaintiff recognized in the proceedings before the Oklahoma court that the FCC had to resolve the underlying merits of the current dispute. However, it nevertheless decided to voluntarily dismiss the action in Oklahoma and institute a fundamentally similar one in this jurisdiction. Consequently, plaintiff has contributed to the delay and expense associated with the resolution of this controversy that it is seeking to prevent.[15]

15. The court notes that the FCC has consistently acted in an expedited fashion when requests for

### III. Plaintiffs' Request for Injunctive Relief [16]

Having concluded that the invocation of the doctrine of primary jurisdiction is appropriate; the court further concludes that it shall not entertain plaintiffs' request for injunctive relief. The court so concludes because to engage in an analysis of whether injunctive relief should issue in this case, would require the court to analyze the underlying merits of the case, thereby encroaching into the FCC's primary jurisdiction. "This is precisely what the doctrine of primary jurisdiction is designed to avoid." *Atchison, T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 821, 93 S.Ct. 2367, 2382, 37 L.Ed.2d 350 (1973); *see also MCI Communications Corp. v. AT & T*, 496 F.2d 214 (3d Cir.1974); *Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031 (10th Cir.1993). The issuance of an injunction pending further agency action may indicate the court's opinion on the viability and legal validity of plaintiffs' claims—a result that should be avoided.

Moreover, plaintiffs do not dispute the fact that they are free to seek injunctive relief from the FCC. Section 4(i) of the Communications Act, 47 U.S.C. § 154(i), provides that the FCC may issue "such orders, not inconsistent with this [Act], as may be necessary in the execution of its functions." 47 U.S.C. § 154(i). This section has been interpreted by the Supreme Court as allowing the FCC to grant interim relief. *U.S. v. Southwestern Cable Co.*, 392 U.S. 157, 181, 88 S.Ct. 1994, 2007, 20 L.Ed.2d 1001 (1968). In addition, the FCC has, in the past, applied the same standard as this circuit in assessing requests for preliminary injunctions. That is, the moving party must show: a substantial likelihood of success on the merits; that relief is necessary to prevent irreparable harm; that temporary relief will not substantially harm other interested parties; and that temporary

relief will be in the public interest. *See* Order, *Participation by COMSAT Corp. in a New Imarsat Satellite Sys.*, 10 FCC Rcd. 1061 (1995) (*citing Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C.Cir.1977)); Memorandum Opinion and Order, *Business Wats, Inc. v. AT & T*, 7 FCC Rcd. 7942 (1992); Memorandum Opinion and Order, *Whitney Cablevision v. Southern Indiana Gas & Elec. Co.*, 1984 FCC LEXIS 1629 (FCC Nov. 16, 1984).

Lastly, the court concludes that no useful purpose would ensue by the retention of jurisdiction in this case. "The primary jurisdiction doctrine allows a district court to dismiss, or stay, an action over which it has subject matter jurisdiction." *AT & T v. MCI Communications Corp.*, 837 F.Supp. 13, 16 (D.D.C.1993); *see also Allnet Communication Service, Inc.*, 965 F.2d at 1120. The central claims in this case are those which allege violations of the Communications Act and which lie within the FCC's primary jurisdiction.

The remaining claims are for breach of contract, intentional interference with business relations, and quantum meruit. These claims are fundamentally premised on the central claims; and are thus incidental in nature. *See Far East Conf. v. United States*, 342 U.S. 570, 577, 72 S.Ct. 492, 495–496, 96 L.Ed. 576 (1952). Plaintiffs' breach of contract claim is dependent upon the validity of TTS's tariff. The viability of the intentional interference of business relations claim depends upon the appropriateness of AT & T's decision not to interconnect its services with those of TTS. Similarly, plaintiffs' quantum meruit claim depends upon the FCC's determination of the validity and reasonableness of TTS's tariff and practices. The entire dispute will therefore be resolved by the FCC and as such the court finds no reason to

---

injunctive relief have been lodged before it. *See, e.g.*, In *Participation by COMSAT Corp. in a New Imarsat Satellite Sys.*, 10 FCC Rcd. 1061 (1995) (ruling within thirty-six days); Order, *TKR Cable Co.; Petition for Stay*, 9 FCC Rcd. 3189 (1994) (acting within a month); Public Notice, *Denver Area Educational Telecommunications Consortium, Inc. v. Telecommunications, Inc.*, 1995 FCC LEXIS 6520 (FCC Oct. 4, 1995) (acting within days); Report and Order, *Southern New England*

*Tel. Co. Expedited Petition for Emergency Interim Relief, Preliminary Injunction and Stay*, 1995 WL 619499, 1995 FCC LEXIS 6687 (FCC Oct. 10, 1995) (same).

**16.** The following discussion on injunctive relief applies equally to plaintiffs' motion for a preliminary injunction and plaintiffs' application for a temporary restraining order.

hold the lawsuit in abeyance.[17] Accordingly, this action shall be dismissed.

## IV. Conclusion

Resolution of the issues before the court by the FCC, the agency charged by Congress with regulating the telecommunications industry, will promote uniformity of regulation of the telephone industry and prevent the possibility of inconsistent results. Since agency referral is appropriate, the court declines to entertain plaintiffs' request for injunctive relief in order to avoid encroaching upon the province of the FCC by engaging in an analysis of the underlying merits of this action. The court further concludes that holding this action in abeyance is unnecessary under the circumstances of this case and therefore this action is dismissed.

Accordingly, pursuant to this court's order dated February 29, 1996,

(1) Defendant's Motion to Refer this Case to the Federal Communications Commission is hereby **granted;**

(2) Plaintiffs' Motion for a Preliminary Injunction is hereby **denied;**

(3) Plaintiffs' Application for a Temporary Restraining Order is hereby **denied;** and

(4) All other Motions are hereby **denied** as moot.

---

**17.** Plaintiffs rely on two cases for the position that the court should not dismiss the case. However, both cases are distinguishable from this case. In *American Ass'n of Cruise Passengers v. Cunard Line,* 31 F.3d 1184 (D.C.Cir.1994), the court held that the district court should not have dismissed claims over which it had original jurisdiction. In that case, the two sets of claims brought forward by plaintiff were legally distinct and had to be brought in two separate fora, the Federal Maritime Commission and the district court. Furthermore, the FMC's primary jurisdiction was not implicated by the claims that had to be brought in district court. Conversely, the claims in this case are not legally distinct and the incidental claims do implicate the FCC's primary jurisdiction. In addition, in *In re Long Distance Tele. Litigation,* 831 F.2d 627 (6th Cir.1987), the court explicitly found that the court should not have dismissed counts which did not require "agency expertise for their treatment." *Id.* at 633. The court also stated that if the dismissed counts related to the issue rates or service, then dismissal would be appropriate. *Id.* at 634. The incidental claims in this case are intricately intertwined with the others, and as such require agency expertise for their resolution.